**Pension Agreements Between Heppenstall Company and the United Steelworkers of America, Local Union Nos. 1601 and 7378.**

### PENSION BENEFIT GUARANTY CORPORATION, Appellant,

v.

**HEPPENSTALL COMPANY and United Steelworkers of America, Local 1601 and United Steelworkers of America, Local 7378.**

**Pension Agreements Between Heppenstall Company and the United Steelworkers of America, Local Union Nos. 1601 and 7378.**

### PENSION BENEFIT GUARANTY CORPORATION, Applicant,

v.

**HEPPENSTALL COMPANY and United Steelworkers of America, Local 1601 and United Steelworkers of America, Local 7378.**

### Appeal of UNITED STEELWORKERS OF AMERICA, AFL–CIO.

Nos. 79–2224, 79–2225.

United States Court of Appeals, Third Circuit.

Argued May 22, 1980.

Decided July 30, 1980.

Henry Rose, Mitchell L. Strickler, James N. Dulcan, Stephen D. Schreiber, argued, Renae R. Hubbard, Washington, D. C., for appellant, Pension Benefit Guaranty Corp.; Bernard Kleiman, Chicago, Ill., of counsel.

William H. Powderly, III, argued, Richard D. Brown, Hollis J. Garfield, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellee, Heppenstall Co.

Daniel P. McIntyre, argued, Pittsburgh, Pa., for appellees, cross-appellants, United Steelworkers of America.

Before SEITZ, Chief Judge, and GIBBONS and ROSENN, Circuit Judges.

GIBBONS, Circuit Judge.

Pension Benefit Guaranty Corporation (PBGC) appeals from an order of the district court fixing June 28, 1979, as the date of termination of a pension plan maintained by Heppenstall Company (the employer) and covered by Subtitle B of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1321 *et seq.* (1976). The United Steelworkers of America (the union), a collective bargaining representative which negotiated for the terminated plan, cross appeals, urging that the court improperly granted summary judgment terminating the plan and fixing a termination date. The employer urges that the termination was proper and the termination date selected is mandated by the governing statute. We vacate and remand.

I.

The Termination Insurance Scheme

A feature of ERISA which in this case comes under judicial scrutiny for the first time is the insurance program for payment of vested pension benefits when a pension plan is terminated with assets which are insufficient to pay those benefits in full. The statute creates a United States Government corporation (PBGC) which administers a self–financing pension plan termination insurance program. PBGC guarantees the payment of vested benefits, subject to a limit of the lesser of 100 percent of the

employee's wage during his highest paid 5 years, or $750 a month. When a plan provision has been in effect for less than 5 years on the date of termination insurance coverage is prorated at the rate of 20 percent a year. 29 U.S.C. § 1322 (1976). To pay for the cost of this insurance all covered pension plans must pay PBGC an annual premium. 29 U.S.C. § 1307 (1976). The statute imposes liability upon employers who terminate a plan and thereby cause PBGC to be liable on its guaranty for the lesser of the difference between plan assets and plan liabilities, or 30 percent of the employer net worth on a date chosen by PBGC not more than 120 days prior to the date of termination. 29 U.S.C. § 1362 (1976). This contingent employer liability may be insured against by an optional additional insurance coverage for which an employer must pay an additional annual premium. 29 U.S.C. § 1323 (1976). Thus the statutory scheme provides for mandatory insurance of benefits and optional insurance of employer contingent liability. Its purposes are,

> (1) to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants,
>
> (2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which this subchapter applies, and
>
> (3) to maintain premiums established by [PBGC] under section 1306 of this title at the lowest level consistent with carrying out its obligations under this subchapter.

29 U.S.C. § 1302(a)(1), (2), (3) (1976). PBGC must prescribe such insurance rates, based on its experience in each category of risk, as may be necessary to provide sufficient revenue to fund the insured benefits. 29 U.S.C. § 1306 (1976).

Since both the mandatory and optional insurance coverages only apply upon termination of a pension plan, the date of termination is critical for the determination of PBGC's liability. Prolongation of a financially unsound plan may increase PBGC's liability exposure in several ways. First, in many instances the level of vested pension benefits due employees will increase because they are calculated as a multiple of years of service or a percentage of highest years' wages. Second, some plans provide for the payment of kinds of benefits which are not insured, or for benefits in excess of the insurance limits. Before the plan is terminated its assets may be depleted by such payments. The statute makes provision for recovery of some payments from participants in excess of insured amounts, but in limited amounts and for limited times. 29 U.S.C. § 1345 (1976). Finally, if an employer has not elected to insure its contingent liability, the amount which PBGC can recover pursuant to 29 U.S.C. § 1362 may decrease because the employer's net worth is declining, at the same time that PBGC's liability to participants is increasing. PBGC's exposure (and its future premium level) thus depends on: 1) plan liabilities to holders of vested pension rights; 2) plan assets; 3) recapture of benefit payments; and 4) recovery from uninsured employers. Each of these amounts, in turn, vary with the date of termination of an insured plan. The statute provides for several methods of plan termination.

A plan administrator[1] may, pursuant to the terms of the plan, decide upon termination. If it does so it must give PBGC ten days advance notice, and may not within 90 days after the proposed termination date make payouts pursuant to the plan's termination procedure. In that 90 day period PBGC, if it determines that the plan's assets are sufficient to discharge the plan's obligations, must notify the plan administrator of such determination. 29 U.S.C. § 1341 (1976). For such voluntary terminations the termination date is that agreed upon by the plan administrator and PBGC. 29 U.S.C. § 1348 (1976). The court plays no role in selecting the date.

Because termination and asset preservation are so critical to PBGC's liability exposure the statute also provides for involuntary termination. PBGC may under 29 U.S.C. § 1342 (1976) institute proceedings to

---

1. Plan administrators, as in this case, are usually employers. *See* 29 U.S.C. § 1002(16) (1976).

terminate a plan whenever it determines that certain events have transpired. For present purposes the most significant ones are inability of the plan to pay benefits when due, and the reasonable expectation of increases in possible long–run losses to PBGC. When it makes such a determination PBGC may apply to a district court, upon notice to the plan administrator, for the appointment of a trustee, 29 U.S.C. § 1342(b), and "for a decree adjudicating that the plan must be terminated in order to protect the interests of the participants and to avoid any further deterioration of the financial condition of the plan or any further increase in the liability of the fund." 29 U.S.C. § 1342(c). The appointment of a trustee and the decree of termination are separate events. A trustee appointed under section 1342(b) is authorized to take a position respecting termination different from that of PBGC,[2] although that authority is difficult to reconcile with the provision that "[PBGC] may request that it be appointed as trustee in any case." 29 U.S.C. § 1342(b). Moreover, even when PBGC commences an involuntary termination proceeding it and the plan administrator can agree that the plan be terminated and a trustee appointed "without proceeding in accordance with the requirements of this subsection." 29 U.S.C. § 1342(c). If PBGC and the plan administrator so agree, the date of termination is the date they agree upon. 29 U.S.C. § 1348(2) (1976).

Section 1341 dealing with voluntary termination provides that either the plan administrator or PBGC may apply to the court for the appointment of a trustee "if the interests of the participants and beneficiaries would be better served by the appointment of the trustee." 29 U.S.C. § 1341(g). Such a trustee appears to have authority to continue the operation of a plan. 29 U.S.C. § 1342(d)(1)(A). However, the statute provides that "[a]s soon as practicable after his appointment, the trustee shall give notice to interested parties of the institution of pro-

ceedings under this subchapter to determine whether the plan should be terminated or to terminate the plan, whichever is applicable." 29 U.S.C. § 1342(d)(2). Interested parties include the plan administrator, each participant, each beneficiary of a deceased participant, and each employer who may be subject to liability to PBGC. 29 U.S.C. § 1342(d)(2)(A), (B), (C). Peculiarly, this subsection dealing with the duty of a trustee is the only place in which the statute makes express provision for notice to participants prior to termination. Moreover, section 1348 contemplates that the plan administrator and the trustee can agree on the date of termination.

Thus, it is only in the case where the plan administrator and PBGC or a trustee fail to agree upon a date of termination that the court has any role in fixing it. When "no agreement is reached between the plan administrator and [PBGC] (or the trustee), the date [is] established by the court." 29 U.S.C. § 1348(3). Nowhere in the statute, however, is there any explicit standard for the court's guidance in selecting a date. Moreover, the parties have not called to our attention any legislative history suggesting any specific congressional attention to that problem. Still, we do not think that the court's discretion in resolving a dispute over an appropriate date can have been intended to be standardless. Rather, a fair reading of the statute as a whole suggests that the court must select the date which it determines is most consistent with the purposes of the insurance subtitle.

## II.

### The Instant Proceedings

The employer is a sponsor of a qualified pension plan, funded through a tax–qualified trust of which Pittsburgh National Bank is the trustee. The employer is the plan administrator. From 1950 through 1976 it made plan contributions. Section

---

**2.** "If the trustee appointed under subsection (b) of this section disagrees with the determination of the corporation under the preceding sentence he may intervene in the proceeding relat-

ing to the application for the decree, or make application for such decree himself." 29 U.S.C. § 1342(c).

1343 imposes on plan administrators the obligation to report to PBGC certain "reportable events" relevant to PBGC's decision to institute termination proceedings. In August, 1977, in compliance with 29 U.S.C. § 1343(b) (1976), the employer notified PBGC that it was experiencing temporary cash problems and that as a result its contributions to the trust would not meet the minimum funding standards under 26 U.S.C. § 412 (1976) for a tax-qualified pension plan. The employer urged, however, that no termination application be made because the trust had assets sufficient to assure benefits for the immediate future, it was unlikely that the inability to make payments would continue, and continuation was in the best interests of the participants. PBGC apparently agreed, for it did not then commence involuntary termination proceedings.

On October 31, 1978, the employer notified PBGC that no contributions had been made for the plan fiscal years ending October 31, 1977, or October 31, 1978, that its financial condition precluded contributions in the foreseeable future, and that the trust assets were insufficient to pay benefits for more than a few months. It advised PBGC that termination was necessary, but that it could not voluntarily terminate pursuant to 29 U.S.C. § 1341 because its collective bargaining agreement with the union prevented voluntary termination.[3] In November, 1978, the employer requested PBGC to seek involuntary termination. PBGC representatives met with representatives of the union to explore whether any course of action short of termination could assure uninterrupted flow of benefits to participants. Concluding that there was no such course of action, on December 18, 1978, PBGC, for the first time in its history, filed a complaint seeking a decree adjudicating that the plan should be terminated as of that date. The employer and two union locals were named as respondents. When the parent international moved successfully to intervene the locals were dismissed. It was PBGC's position before the trial court that naming the union as a respondent was a matter of grace, and that the employer plan administrator was the only necessary respondent to its section 1342(c) application for termination. The employer's answer agreed that termination was necessary, but prayed that the date of termination be fixed as of the date of the court's decree terminating the plan. The intervenor union's answer pleaded that it was without sufficient knowledge to admit or deny PBGC's allegations that "[t]ermination of the Plan [was] necessary to protect the participants' interest in the uninterrupted payment of pension benefits, to avoid any further deterioration in the financial condition of the Plan, and to avoid any increase in . . . [PBGC] liability . . . ."[4]

For reasons which are not clear, none of the parties brought to the trial court an application for the pendente lite appointment of a trustee until after May 31, 1979, when the employer filed a motion for summary judgment fixing May 31, 1979, as the termination date and ordering PBGC to pay the benefits which, under the statute, it guaranteed. Meanwhile payments of monthly benefits to pensioners totaling about $100,000 were made from the plan assets. The employer's motion for summary judgment, which is not supported by an affidavit, alleges that on May 31, 1979, it ceased all operations and terminated over 330 hourly workers. It alleges, further, that the plan provides for large lump sum payments from the pension trust immediately upon retirement, that 115 additional hourly workers would qualify for retirement upon termination, that aggregating the lump sum payments to these 115 workers with the monthly payments due to previous retirees, the plan would owe payments on June 10, 1979, of $426,000, while it had assets of only $155,000.

---

**3.** This case does not present the question whether, in light of sections 1341(a) and 1342(e), the employer could in a collective bargaining agreement bind itself not to voluntarily terminate a plan whose continuation exposes PBGC to increased liabilities.

**4.** The union also filed a crossclaim against the employer, which it subsequently withdrew.

On June 8, 1979, PBGC filed a motion for summary judgment terminating the plan as of December 18, 1978. That motion was supported by the affidavit of Carl Harbachewski, case officer in the Office of Program Operations of PBGC, dated April 4, 1979, outlining the history leading up to PBGC's determination that the plan should be terminated, disclosing that the employer had entered into an agreement with the Park Corporation of Charlestown, West Virginia, for the liquidation of its assets, with a resulting reduction in employees, and stating that the current PBGC liability for benefits guaranteed under ERISA exceeded plan assets available to satisfy those liabilities by at least $10 million. Neither the employer nor the union filed opposing affidavits.[5]

On June 18, 1979, PBGC orally moved for an order appointing it as statutory trustee, with the understanding that pending final determination by the court of a termination date it would pay retirement benefits at the level guaranteed in section 1322, calculated assuming a December 18, 1978 termination date, and an order was entered to that effect.

On June 27, 1979, the trial court heard final argument on the termination and termination date issues. In that argument no one disputed that the employer was being liquidated and had ceased all operations on May 31, 1979, no one disputed that the fund assets totaled only $155,000, no one disputed that if a date later than December 18, 1978, were selected as the termination date the number of eligible pensioners and the level of benefits would be significantly higher, and no one disputed that if the special lump sum payments due on termination of employment were paid the plan assets in the hands of the bank trustee would be exhausted.

The union's position at argument was that the employer owed the plan accrued unpaid contributions for prior years, and that if these unpaid contributions were collected the plan would not be insolvent. Thus, it argued, the plan should not be terminated and a termination date should not be fixed without exploring the collectibility of this employer liability. It conceded that the bank trustee did not, under the terms of the indenture, have the duty or authority to compel payments of contributions, but urged that PBGC as statutory trustee had such authority. It also withdrew its crossclaim against the employer for enforcement of the provisions of the collective bargaining agreement requiring payment of contributions sufficient to fund the plan.[6]

The employer's position at argument was that PBGC should not be given the benefit of a termination date retroactive to December 18, 1978, for two reasons. First, it urged, employees had continued to work in the meantime, and should not be deprived of accrued vested pension rights by a retroactive termination date. Second, a December 18, 1978 date would increase the amount which PBGC could recover from it under section 1362, since the 30 percent of net worth limitation is calculated "as of a day, chosen by the corporation but not more than 120 days prior to the date of termination . . . ." 29 U.S.C. § 1362(b)(2). The employer had, according to representations in the exhibits attached to Mr. Harbachewski's affidavit, been losing money for some time. Risk of the delay in obtaining a court order terminating the plan and fixing a date of termination should, the employer urged, be borne by PBGC.

PBGC's position at argument was that when the appropriate termination date is contested the court clearly has the power to fix a date earlier than the date of its final

---

**5.** There is in the record pleading No. 25, an unsigned paper appearing to be a proposed affidavit by a union representative, to the effect that he had been informed that after liquidation the employer will have assets of $11 million, of which $10 million would be available to pay employee claims. No reference is made to this affidavit in the recitals in the order appealed from.

**6.** A suit by former employees against the employer for similar relief is pending in the district court before another judge.

judgment, and that applying the criteria of section 1342(c) it should select the date of filing of the complaint, since by then it was clear that the plan should not have been continued. It relied heavily on the fact that it was a self-financing insurance corporation, and urged that a principal purpose of section 1342 was to protect it, and ultimately other premium paying pension funds, from continued accruals of liabilities by unsound plans. It pointed out that the trust was underfunded by $12 to $15 million, assuming a December 18, 1978 termination date, but that by moving the date to a time after May 31, 1979, PBGC's liability would increase $3 to $4 million.

The court held that the plan should be terminated and that the termination date must, as a matter of law, be the date of its final judgment.

### III.

### Discussion

■ The district court properly terminated the pension plan since at the time of its June 28, 1979 order the plan was insolvent. As indicated *supra*, PBGC filed an affidavit with its summary judgment motion stating that PBGC liabilities exceeded plan assets by at least $10 million. The union responded with an unsigned affidavit asserting that the employer possessed $10 million from liquidation for satisfaction of pension claims. Since this affidavit was unsigned it was not in evidence and could not provide any basis for denying the summary judgment motions. In its absence there was no evidence contradictory of the PBGC affidavit. Moreover, even assuming that the unsigned affidavit could properly have been considered by the district court, that court still did not err in summarily terminating the plan. The $10 million liquidation fund was relevant only insofar as it indicated that the employer possessed the resources with which to discharge its plan obligations. Those obligations consisted of unpaid 1977 and 1978 plan year contributions. The union submitted no evidence probative of the amount of unpaid contributions. In its memorandum opposing sum-

mary judgment the union alleged that the unpaid contributions approximated $2.5 million. However, this $2.5 million account receivable represented by plan contributions owed still could not make up for the $10 million shortfall. Indeed, the Harbachewski affidavit understates the shortfall. The $10 million figure quoted therein represents the difference between plan assets and plan benefits guaranteed by PBGC. Benefits payable under the plan exceed benefits guaranteed by PBGC.

■ The district court did err, however, in holding that as a matter of law the termination date could only be the date of final judgment. The statutory standard in section 1342(c) is that termination should be adjudicated "in order to protect the interests of the participants and to avoid any further deterioration of the financial condition of the plan or any further increase in the liability of the fund." Imposing on PBGC the entire risk of delay in the litigation process certainly maximizes the interests of participants by maximizing the period during which, if still employed, they may gain accrued vested rights. But it reads out of the statutory standard the purpose of protecting the PBGC fund from increases in liability. In selecting a termination date the court must take that purpose into account.

■ We reject as well the employer's argument that its potential liability under section 1362 is a relevant consideration in allocating the litigation delay risk to PBGC. The plain language of section 1342(c) gives the employer as plan administrator the option of agreeing with PBGC on a termination date, and thereby eliminating entirely any litigation delay. On the other hand an employer whose business is losing money has no incentive to arrive at a prompt determination of the termination date, since as its net worth shrinks its liability to PBGC shrinks as well. The employer contends that its collective bargaining agreement with the union tied its hands by prohibiting its consent. Assuming arguendo that such an agreement could be effective

against the authority to consent conferred on plan administrators in section 1342(c), a question we need not decide, the collective bargaining agreement was not made by PBGC, and is no reason for allocating the risk of litigation delay to it. PBGC has a statutory right to seek and obtain termination which parties to a collective bargaining agreement may not modify.

█ PBGC suggests that we should determine that as a matter of law December 18, 1978, was the appropriate date. Its principal argument is that the court should accede to its administrative expertise as to when a plan should be terminated. But while PBGC's views on a date obviously should be accorded fair consideration, the statutory scheme relegates resolution of disputes over termination to the court in the first instance, not to PBGC. As an insurer in what is essentially a mutual insurance company its obvious interest is to protect the fund and future premium payors. Congress determined that in the absence of agreement between PBGC and a plan administrator the court would protect participants from overly cautious use of the involuntary termination feature of the insurance scheme. PBGC's administrative expertise is not, therefore, a sound reason for selecting the date on which it chose to file the complaint.

In order to balance the competing interests of the fund and the participants in an appropriate termination date it is necessary to identify those interests. With respect to PBGC we have already done so. The interests of participants vary. A participant "means any employee or former employee . . . who is or may become eligible to receive a benefit . . . or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(7). Thus participants include both retirees and employees. The termination date affects retirees only to the extent that the payments guaranteed under ERISA are less than they are currently receiving, or to the extent that benefits already received may be recaptured under 29 U.S.C. § 1345. There is nothing in the record disclosing whether any retirees

will be affected. The termination date affects employees in quite a different way, by fixing the date beyond which, whether or not they continue to work, they no longer accrue additional vested pension rights. This, obviously, is an expectation or reliance interest. As to vested rights already accrued they are insured to the same extent as retirees.

█ Focusing on employee expectations, it seems clear that no employee had any justifiable expectation in a termination date later than May 31, 1979, when the employer ceased all operations. Thus assuming no retiree interests are involved, and perhaps even if they are, it seems unlikely that the selection of any termination date later than May 31, 1979, could be proper. As to any earlier date, the facts have not been sufficiently developed for a date to be selected. For example, the amount or the likely collectibility of the unpaid contributions for the plan years ending October 31, 1977, and October 31, 1978, has not been ascertained. And the record does not indicate when employees received notice of PBGC's termination determination.

█ Notice to participants is not treated with any kind of precision in the statute. If a trustee is appointed under section 1342(b) he has the power "to do such other acts as he deems necessary to continue operation of the plan without increasing the potential liability of [PBGC] . . . ." 29 U.S.C. § 1342(d)(1)(A)(v). If a trustee seeks termination he must give notice to "each participant in the plan and each beneficiary of a deceased participant . . . ." 29 U.S.C. § 1342(d)(2)(B). But when PBGC seeks termination it need only notify the plan administrator, who, as we indicated above, may consent. We suppose that it was the expectation of Congress that if a plan administrator consents to termination it will notify employees, who will thereafter have no justifiable expectation in a plan's continuation. Absent such consent, however, it seems unlikely that Congress intended to leave employees in the dark about a possible termination while they continued to work. Section 1342(c) gives them a stat-

utory right to consideration of the protection of their interests in contested termination proceedings. Such a right implies, we think, an obligation to give them some form of notice. Possibly notice to their collective bargaining representative as a class representative is sufficient. But we conclude that the earliest date which could properly be selected by the court is that date on which participant employees had some reasonable notice that PBGC was seeking termination, and thus that they no longer had a justifiable expectation in the accrual of vested pension rights.

In between the date of such reasonable notice and the May 31, 1978 date when the employer terminated its operations, and thereby effectively gave notice of termination, the court will have to consider what date is appropriate. If on the date the employees received reasonable notice of PBGC's application for termination the financial condition of the plan and the employer was such that PBGC was at risk of an increase in liability on its guaranty, the statute seems to us to require selection of that date. In the unlikely event that it can be established that there was no such risk until a later date, taking into account, (1) any unpaid and collectible contributions for prior years, and (2) amounts likely to be recoverable under section 1362, then a later date may be selected. But while, considering the representations which were made to the trial court about PBGC's exposure, it seems unlikely that the absence of such risk can be established, that determination was not made by the trial court, and on this record cannot be made here.

One other observation is in order. This first instance in which PBGC has had to seek involuntary termination has demonstrated that Subtitle B of ERISA badly needs technical clarification, possibly by regulation, but preferably by amendment. The role of participant employees in involuntary termination proceedings in particular is treated with almost incomprehensible vagueness.

That portion of the June 28, 1979 order terminating the plan will be affirmed. The portion establishing June 28, 1979, as the termination date will be vacated and the case remanded for further proceedings consistent with this opinion. Each party shall bear its own costs.

