In re The SYNTEX FABRICS, INC. PENSION PLAN.

PENSION BENEFIT GUARANTY CORPORATION

v.

DICENSO, Alfred P., Livermore, Donald L., Bailey, Rodney N., Ohnmeiss, Jr., Raymond F. as Administrative Committee of the Syntex Fabrics, Inc. Pension Plan; Syntex Fabrics, Inc. and Local 186 of the Textile Workers Union of America

v.

JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY.

Appeal of PENSION BENEFIT GUARANTY CORP., in No. 82–3268.

Appeal of Donald LIVERMORE, Raymond Ohnmeiss and Local 186 of the Textile Workers Union of America, in No. 82–3291.

Nos. 82–3268, 82–3291.

United States Court of Appeals, Third Circuit.

Argued Jan. 7, 1983.

Decided Jan. 19, 1983.

Henry Rose, Gen. Counsel, Mitchell L. Strickler, Deputy Gen. Counsel (argued), James N. Dulcan, Asst. Gen. Counsel, Stephen D. Schreiber, Trial Atty., Renae R. Hubbard, Sp. Counsel, Pension Benefit Guaranty Corp., Washington, D.C., for appellant, Pension Benefit Guaranty Corp.

Robert J. Bach (argued), New York City, Ira H. Weinstock, Harrisburg, Pa., for appellants, Donald Livermore, Raymond Ohnmeiss and Local 186 of the Textile Workers Union of America.

McCormick, Reeder, Nichols, Sarno, Bahl & Knecht, Williamsport, Pa., for Syntex Fabrics, Inc.

Murphy, Mussina, Harris, Travis, Rieders & Humphrey, John M. Humphrey (argued), Williamsport, Pa., for appellee John Hancock Life Ins. Co.

Before ALDISERT, GIBBONS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

Pension Benefit Guaranty Corporation (PBGC) appeals from an order of the District Court for the Middle District of Pennsylvania establishing November 11, 1977 as the termination date of a pension plan (Plan) maintained by Syntex Fabrics, Inc. (Syntex) and covered by Subtitle B of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1321–1323 (1976 & Supp. V 1981). PBGC is joined in its appeal by Raymond Ohnmeiss, Jr. and Donald L. Livermore, members of the committee which administers the Plan, and Local 186, Textile Workers Union of America (Union), which negotiated as a collective bargaining representative for the Plan. Syntex and John Hancock Mutual Life Insurance Co. (John Hancock), a third party defendant which purchased annuities for the Plan, contend that the termination date fixed by the district court was consistent with the goals of ERISA. We reverse.

### I.

### The Termination Insurance Scheme

In Subchapter III of ERISA Congress established a self-financing program to insure, *inter alia,* the participants of qualified private pension plans against the consequences of plan termination when assets are insufficient to pay vested benefits in full. 29 U.S.C. § 1001(a)(1976); *Nachman Corp. v. PBGC,* 446 U.S. 359, 362, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980). To administer this program, Congress created PBGC, a United States Government corporation intended to further the following statutory goals:

(1) to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants,

(2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which this subchapter applies, and

(3) to maintain premiums established by [PBGC] under section 1306 of this title at the lowest level consistent with carrying out its obligations under this subchapter.

29 U.S.C. § 1302(a) (1976). PBGC guarantees the payment of vested benefits under qualified pension plans, subject to a monthly limit of the lesser of $750 multiplied by a fractional amount that reflects the contribution and benefit base or the employee's average monthly gross income during his highest paid five years. 29 U.S.C. § 1322(b)(3) (1976 & Supp. V 1981). If the plan has been in effect for less than five years, then monthly benefits are guaranteed only up to the greater of twenty dollars or twenty percent multiplied by the number of years the plan was in effect. 29 U.S.C. § 1322(b)(7) (1976 & Supp. V 1981).

The cost of this insurance is subsidized by the payment of annual premiums by all covered pension plans. 29 U.S.C. §§ 1306, 1307 (1976 & Supp. V 1981). PBGC can also recoup some of its costs from two additional sources. An employer who maintained a terminated plan which caused PBGC to be liable on its guarantee is itself liable for the lesser of the difference between plan assets and liabilities on the termination date or 30 percent of the employer's net worth on the date of PBGC's choice within the 120 day period preceding the termination date. 29 U.S.C. § 1362(b) (1976 & Supp. V 1981).[1] In addition, PBGC may recover limited amounts of benefits paid under the pension plan to participants after the termination date. 29 U.S.C. § 1345 (1976).

Because the extent of PBGC's liability on its guarantee is dependent on such factors as plan liabilities to holders of vested pension rights, plan assets, recapture of benefit payments, and the net worth of employers, all of which vary with the passage of time, the termination date of a pension plan is of

---

1. ERISA originally provided for optional employer insurance against such liability, 29 U.S.C. § 1323 (1976), but such coverage was never offered by PBGC. Congress repealed this section in 1980, having determined that

"such a program ... would undermine the financial soundness of the guarantee program." H.R.Rep. No. 869, 96th Cong., 2d Sess. 107, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2918, 2975.

critical importance. *PBGC v. Heppenstall Co.,* 633 F.2d 293, 296 (3d Cir.1980). The termination of a single-employer plan may be initiated by either the plan administrator or PBGC. Under the former method, governed by 29 U.S.C. § 1341, the plan administrator must notify PBGC at least ten days in advance of the proposed termination and must withhold all payouts for at least ninety days after the proposed date. 29 U.S.C. § 1341(a) (1976 & Supp. V 1981). During this period, PBGC is expected to determine the solvency of the plan. If the plan's assets are sufficient to cover all vested benefits, PBGC must so notify the plan administrator. In such cases, the termination date is the date established by the plan administrator and agreed to by PBGC, 29 U.S.C. § 1348(a)(1) (1976 & Supp. V 1981).

If PBGC is unable to make such a determination or if PBGC or the plan administrator discovers an insufficiency after termination has begun, section 1341 directs that PBGC must commence proceedings in accordance with the provisions of 29 U.S.C. § 1342. 29 U.S.C. § 1341(c), (e) (1976 & Supp. V 1981). Section 1342 proceedings may be commenced in fact whenever PBGC determines, *inter alia,* that plan assets are insufficient or that there may be unreasonable increases in possible long-run losses to PBGC if the plan continues. 29 U.S.C. § 1342(a) (1976 & Supp. V 1981). Under section 1342, either PBGC or the plan administrator may petition the district court for the appointment of a trustee. 29 U.S.C. § 1342(b) (1976 & Supp. V 1981). In addition, PBGC may be granted a decree adjudicating termination of the plan if the court finds such termination necessary to protect the interests of the participants in their vested benefits and the interest of PBGC in avoiding increased liability. 29 U.S.C. § 1342(c) (1976 & Supp. V 1981). Despite the so-called involuntary nature of a section 1342 proceeding, PBGC and the plan administrator can still agree to terminate the plan and appoint a trustee without resort to the court. 29 U.S.C. § 1342(c) (1976 & Supp. V 1981). If this is done, the termination date

is that date established by PBGC and agreed to by the plan administrator. 29 U.S.C. § 1348(a)(2) (1976 & Supp. V 1981). If there is no agreement between PBGC and the plan administrator, either in a section 1341 or section 1342 proceeding, the termination date is that date established by the court. 29 U.S.C. § 1348(a)(3) (1976 & Supp. V 1981).

ERISA does not specify what standards should guide the court in establishing the termination date. This circuit addressed that question in *PBGC v. Heppenstall Co.,* 633 F.2d 293 (3d Cir.1980). In *Heppenstall* a collective bargaining agreement prohibited the employer, who was also the plan administrator, from terminating the plan pursuant to section 1341. Upon concluding that the plan's fund could not continue to provide benefits, PBGC commenced section 1342 proceedings, requesting that the plan be terminated as of December 18, 1978, the date of the complaint. The plan continued to pay out approximately $100,000 in benefits until the employer ceased its operations and terminated its workers on May 31, 1979. The employer requested that the plan be terminated as of this later date. Instead the district court ruled that as a matter of law the termination date must be the date of its final judgment, June 28, 1979. In vacating this order and remanding the case, we stated that section 1342(c) requires the district court to consider the interests of PBGC and the plan participants in fixing a termination date.[2] In the case of PBGC, its interest is the protection of the fund and future premium payments. As for plan participants, retirees are affected by plan termination since their benefits are diminished slightly, and employees are affected to an even greater degree since they no longer accrue additional pension rights. Thus, both have an interest in the continuance of the plan to the extent that they may justifiably rely on such continuance. Reliance is no longer justifiable when plan participants receive actual or constructive notice (such as the cessation of operations) that the plan will be terminated.

**2.** We rejected the contention that the employer's potential liability to PBGC was a relevant

consideration in establishing a termination date pursuant to section 1342(c), 633 F.2d at 300.

## II.

### The Instant Proceedings

Syntex established the Plan at issue here in 1973 in accordance with provisions of a collective bargaining agreement with the Union. A committee of four representatives, last known to be comprised of Rodney B. Bailey, Donald L. Livermore, Alfred P. DiCenso, and Raymond F. Ohnmeiss, Jr., administers the Plan. The pension benefits provided under the Plan are funded through a group annuity contract issued by John Hancock.

On November 11, 1977 Syntex closed down its manufacturing plant and permanently terminated all employees. No further contributions were made to the Plan, a fact of which union representatives were apprised by Syntex on December 19, 1977. By March 1978, the funds held under the contract were depleted by the purchase of individual retirement annuities. John Hancock thus did not acquire annuities for those Plan participants who became eligible for retirement benefits after March.[3]

On September 7, 1978 Syntex notified PBGC that it proposed to terminate the Plan on September 20, 1978. The delay in termination was apparently occasioned by Syntex's belief that the Plan was a defined contribution plan, rather than a defined benefit plan, and thus not subject to the notification requirements of ERISA. On January 14, 1981, PBGC informed the Committee, Syntex, and the Union that it had determined that the Plan's assets were insufficient to pay in full the benefits defined in 29 U.S.C. § 1301(a)(6) (1976). Thus, as directed by 29 U.S.C. § 1341(c),[4] the PBGC commenced proceedings pursuant to 29 U.S.C. § 1342 to terminate the Plan and appoint itself as trustee. Syntex in turn commenced a third party action against John Hancock. PBGC moved for summary judgment terminating the Plan as of September 20, 1978 and appointing PBGC as the Plan's trustee. John Hancock cross-moved for partial summary judgment, requesting a termination date of November 11, 1977.

The district court granted that part of PBGC's motion which requested its appointment as trustee but denied that part requesting that September 20, 1978 be the termination date of the Plan. Instead, the court accepted the date advocated by Syntex and John Hancock—November 11, 1977. After finding that the Plan was a defined benefit plan within the coverage of ERISA and that termination was necessary to protect the interests of the participants, the court analyzed the impact of *Heppenstall* on a case such as this.[5] Under the court's interpretation, *Heppenstall* requires consideration of two interests: that of PBGC in protecting its resources against increased liability and that of the Plan's participants in receiving benefits. According to the court, both these interests were served by an earlier rather than later termination date. In the case of PBGC, "the longer the delay, the greater the statutory liability against the . . . fund." Joint Appendix at 176. As for the Plan participants, the court found that they had no justifiable expectation in the continued existence of the Plan

---

**3.** The district court relied on the uncontested affidavit of Robert A. Michlik, the PBGC case officer responsible for processing the termination of the Plan, for the finding that 74 Plan participants were eligible for pension benefits as of September 20, 1978. Neither the court nor Michlik specified whether these participants became eligible before or after the Plan's funds were exhausted. Joint Appendix at 141, 169.

**4.** 29 U.S.C. § 1341(c) requires the PBGC to commence section 1342 proceedings if it is unable to determine if the plan's assets are sufficient within a 90-day period or extension thereof. The district court opinion does not clarify why section 1341(c) was used as a springboard for section 1342 proceedings rather than section 1341(e), which authorizes such proceedings if the PBGC or the plan administrator finds that the plan is or will be unable to pay benefits when due.

**5.** Although the present case was initiated as a voluntary termination pursuant to section 1341, the district court found that both *Heppenstall* and this case could be characterized as termination proceedings brought by PBGC pursuant to section 1342. *See PBGC v. Dickens*, 535 F.Supp. 922, 925 (W.D.Mich.1982).

beyond the date on which they were permanently furloughed.

## III.

### Discussion

The case before us is the second occasion on which we have been called to elucidate the vague and mystifying termination provisions of ERISA. Section 1348 permits the termination date of a single-employer plan to be fixed by one of three mutually exclusive methods: (1) in the case of a plan terminated under section 1341, the date is that established by the plan administrator and accepted by the PBGC; (2) in the case of a plan terminated under section 1342, the date is that established by the PBGC and accepted by the plan administrator; or (3) in a plan terminated under either section 1341 or section 1342 where no agreement is reached, the date is that established by the court. At issue in *Heppenstall* was a termination date established under the latter method: *i.e.,* a date fixed by the district court in a section 1342 proceeding where the plan administrator refused to agree with the date advocated by the PBGC.

The district court erred here in assuming that the case before it presented the same issue as that in *Heppenstall.* Unlike *Heppenstall,* where the PBGC initiated termination of the plan under section 1342, the termination of the Syntex Plan was initiated under section 1341. While section 1341 requires that PBGC "commence proceedings in accordance with the provisions of section 1342" when the sufficiency of the plan's assets are in doubt, this directive does not change the character of the termination itself. A section 1341 termination is voluntary in nature. The plan administrator—who in many cases is the employer itself, *see PBGC v. Heppenstall,* 633 F.2d at 296 n.

1—is granted the opportunity to determine when the employer's obligation to fund the plan ceases, when employees can no longer accrue benefits, and when PBGC may be required to make good on its guarantee. *See* H.R.Rep. No. 869, 96th Cong., 2d Sess. 101, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2918, 2969. This power is not without its limitations, however. If the plan's assets are or are likely to be insufficient to discharge its obligations, section 1341 does not rely upon the plan administrator to represent the interests of the other affected parties—*i.e.,* the plan participants and PBGC. Instead, PBGC is required to seek the appointment of a trustee who is given the authority to terminate the plan by the court-issued termination decree. 29 U.S.C. § 1342(d)(1)(B) (1976 & Supp. V 1981).[6] In contrast, in a section 1342 termination, PBGC rather than the plan administrator seeks to terminate the plan. Court intervention is necessary not just to appoint a trustee to administer the final days of the plan but to compel termination where necessary despite a passive or even unwilling plan administrator. Such a termination is involuntary rather than voluntary in nature.[7]

Just as the plan administrator's power to supervise termination may be limited by the appointment of a trustee when plan assets are insufficient, so too is the administrator's power to fix the date of termination. Section 1341 grants the plan administrator the authority merely to propose a prospective termination date. Thus, PBGC is alerted to the imminence of termination and may act to safeguard the interests of the fund and the plan's participants. PBGC may conclude that the proposed date has no adverse affect on either its fund or the pension rights of the plan's participants. If so, then PBGC accepts the proposal and that date

---

**6.** This reading of the statute—that section 1341 requires resort to section 1342 primarily to ensure that a trustee rather than the plan administrator terminates an inadequately funded plan—is supported by the fact that under the 1980 amendments to ERISA section 1342 is the sole means whereby such a trustee can be appointed. Pub.L. No. 96–364, § 403(d)(3), 94

Stat. 1301 (1980) (repealing 29 U.S.C. § 1341(g)).

**7.** Thus, we do not accept the assumption in *PBGC v. Dickens,* 535 F.Supp. 922 (W.D.Mich. 1982), that "[u]nder § 1341 a voluntary termination may only occur when the plan assets are sufficient to pay all liabilities of the plan." *Id.* at 925.

**204**

becomes the date of termination. 29 U.S.C. § 1348(a)(1) (1976 & Supp. V 1981). Only when PBGC exercises its right to veto the proposed date in the interests of those which it represents is court intervention necessary to ensure that there is no conflict between the interests of the fund and those of the plan's participants. 29 U.S.C. § 1348(a)(3) (1976 & Supp. V 1981).

Here PBGC accepted Syntex's proposed termination date[8] and resorted to the district court only for the appointment of a trustee who would have the authority granted by a section 1342(c) decree to terminate the Plan. Once PBGC accepted the proposed date, Syntex had no discretion to change its mind. The only justification for allowing such an about-face would be to further the interests of the employer, a concern which is conspicuously absent from the statute. We note that were this a 1342 termination where the plan administrator rejected the date established by PBGC, as apparently the district court believed, the employer's interests would be irrelevant to the court's fixing of the termination date. *PBGC v. Heppenstall,* 633 F.2d at 300–01. In a § 1341 termination, it is assumed that the plan administrator will have the employer's interests in mind when it proposes a termination date. Likewise, it is assumed that PBGC will act as guardian in the first instance of the interests of the fund and the plan's participants. 29 U.S.C. § 1302(a) (1976). Once PBGC determines that such a date is in accord with the interests it is required by statute to protect, that date becomes the final termination date. Court intervention in this aspect of the termination is both unnecessary and unauthorized.

### IV.

#### Conclusion

That portion of the district court's order fixing November 11, 1977 as the termination date of the Syntex Plan will be reversed and the case remanded for entry of an order terminating the Plan as of September 20, 1978.

---

**8.** The filing of the complaint with the district court requesting that the Syntex Plan be terminated as of September 20, 1978 is acceptance sufficient for the purposes of 29 U.S.C. § 1348(a)(1) (1976 & Supp. V 1981).