In re PAN AMERICAN WORLD AIR-WAYS, INC. COOPERATIVE RE-TIREMENT INCOME PLAN.

PENSION BENEFIT GUARANTY CORPORATION, Applicant,

v.

The PENSION COMMITTEE OF PAN AMERICAN WORLD AIRWAYS, INC., as Plan Administrator of the Pan American World Airways, Inc. Cooperative Retirement Income Plan, Respondent.

In re PAN AMERICAN WORLD AIR-WAYS, INC. DEFINED BENEFIT PLAN FOR FLIGHT ENGINEERS.

PENSION BENEFIT GUARANTY CORPORATION, Applicant,

v.

The PENSION COMMITTEE OF PAN AMERICAN WORLD AIRWAYS, INC., as Plan Administrator of the Pan American World Airways, Inc. Defined Benefit Plan for Flight Engineers, Respondent.

Nos. 91 Civ. 5016 (MBM), 91 Civ. 5017 (MBM).

United States District Court, S.D. New York.

Nov. 25, 1991.

Carol Connor Flowe, Gen. Counsel, William G. Beyer, Jeffrey B. Cohen, Carol A. Resch, Mary K. Bentley, David Kemps, Pension Ben. Guar. Corp., Office of Gen. Counsel, Washington, D.C., (Barry G. Radick, Wilbur F. Foster, Jr., Milbank, Tweed, Hadley & McCloy, New York City, of counsel), for applicant.

Samuel A. Flax, Arnold & Porter, New York City, for respondent Pension Committee of Pan American World Airways, Inc.

Malcolm A. Goldstein, O'Donnell, Schwartz, Glanstein & Rosen, New York City, for intervenors Transport Workers Union of America, AFL–CIO; and Flight Engineers' Intern. Ass'n, PAA Chapter, AFL–CIO.

Andrew Irving, Robinson, Silverman, Pearce, Aronsohn & Berman, New York City, for intervenor Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

## OPINION AND ORDER

MUKASEY, District Judge.

This is a petition by the Pension Benefit Guaranty Corporation ("PBGC") to terminate the captioned retirement benefit plans and to fix July 24, 1991 as their termination date, pursuant to 29 U.S.C. § 1342(c). The stated ground for termination is that both plans are underfunded and there is no prospect that their funding can be brought current, with the result that PBGC will have to disburse substantial sums in order to provide minimum benefits to plan beneficiaries. For the reasons set forth below, a decree of termination will issue and the termination date is fixed at July 31, 1991.

The Pension Committee of Pan American World Airways, Inc. (the "Pension Committee") as well as intervenors the Transport Workers Union of America, AFL–CIO, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and the Flight Engineers' International Association, AFL–CIO nominally have opposed both termination and the July 24 termination date, although their opposition to termination itself is directed substantially at the question of whether the necessary findings were or could be made as of July 24. They do not seriously contest that the plans are underfunded.

PBGC made its application by order to show cause on July 23, 1991, directed solely to the Pension Committee, and initially sought an expedited ruling. However, a hearing was held on September 23, 1991 at which a briefing schedule was set to allow all interested parties to examine the sealed administrative record and to submit briefs. Following those submissions the parties and intervenors presented oral argument on November 20, 1991.

## I.

The Administrative Procedure Act allows a court to set aside an administrative determination only on a showing that that determination is arbitrary and capricious, an abuse of discretion, or otherwise unlawful, 5 U.S.C. § 706(2)(A), or unwarranted by the facts to the extent the facts are subject to *de novo* judicial review. 5 U.S.C. § 706(2)(F).

The statute in question in this case, the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), authorizes PBGC to institute administrative proceedings to terminate a plan "whenever it determines that ... the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated." 29 U.S.C. § 1342(a)(4). ERISA also authorizes PBGC to "apply to the appropriate United States district court for a decree adjudicating that the plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund." 29 U.S.C. § 1342(c).

The Pension Committee and the intervenors have argued that the decision to terminate does not promote the best interests of the participants and that any increase in PBGC's potential liability if the plans are not terminated is not unreasonable. By so arguing, they are inviting, at least implicitly *de novo* factual review. Such review is unwarranted. There is nothing in the applicable ERISA provisions to show that the sections of the Administrative Procedure Act cited above should not apply to this decision by PBGC. To find a contrary intent in the statute would be to depart from the usually applicable judicial deference to the expertise of an

administrative agency, particularly when the agency has made an adjudicative decision within its sphere of responsibility. Courts scrutinizing such decisions do not substitute their own judgments for those of administrative agencies. *See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971).

■ Therefore, the Pension Committee and the intervenors would have to show that the PBGC decision to terminate the plans was arbitrary and capricious, *i.e.,* that no reasonable person could have reached the decision to terminate the plans on the evidence contained in the administrative record. This they have failed to do. In fact, the administrative record contains substantial evidence justifying the termination decision, including not only the record of PBGC's own internal consideration of the financial condition of the two plans, R 1037–R 1055 and R 1056–R 1074, the reports by the company that it could not make required periodic contributions, R 725–R 727, R 734–R 736, R 743–R 746, and acknowledgment by counsel on the record during proceedings in Bankruptcy Court that the company could not pay overdue contributions, R 769, but also reports from actuaries, R 8–R 9, and investment bankers, R 400–R 427, confirming that plan liabilities were unfunded and that the company could not make the payments necessary to fund those liabilities fully. Thus, it is evident from the record that the decision to terminate the plans was not arbitrary and capricious.

The Pension Committee and the intervenors argue also that the decision to terminate is contrary to applicable ERISA provisions. This argument is unpersuasive. ERISA established PBGC in part to administer a pension plan termination insurance fund established under Title IV of the statute. 29 U.S.C. § 1302(a)(2). The fund is supported for the most part by mandatory contributions from defined pension plans based on the number of plan participants and potential PBGC liability in the event of plan termination. 29 U.S.C. § 1342(a). The statute guarantees that available plan assets will be used to pay benefits in six categories of priority. 29 U.S.C. § 1344(a). If plan assets are insufficient, PBGC will use money from the fund to pay benefits not covered by plan assets, but only up to certain minimum levels guaranteed by the agency. 29 U.S.C. § 1322(b).

■ The Pension Committee and the intervenors point out that the statute was amended in 1980 to change one of the enumerated grounds for termination from, " 'to avoid *any* further deterioration of the financial condition of the plan or *any* further increase in the liability of the fund,' " *Pension Benefit Guaranty Corp. v. Heppenstall Co.,* 633 F.2d 293, 297 (3rd Cir. 1980) (quoting former 29 U.S.C. § 1342(c)) (emphasis added), to "to avoid any *unreasonable* deterioration of the financial condition of the plan or any *unreasonable* increase in the liability of the fund." (emphasis added) From that amendment, and from a record of the deliberations of PBGC's own Trusteeship Working Group in December 1990 and April 1991 suggesting that PBGC thought "the difference between the benefit liabilities and the guaranteed benefits is not that great," R 359, and that the potential liability from subsidized early retirement benefits "is not a significant factor," R 389, the Pension Committee and the intervenors argue that termination is unwarranted under the statute. Specifically, they assert that in determining whether to terminate the plans, I must weigh the interests of plan beneficiaries against those of PBGC, that only an "unreasonable" potential liability for PBGC can justify termination, and that we have PBGC's own word for it that the prospective liability it faces here is "not that great" and "not a significant factor."

That analysis is flawed for at least three reasons. First, whatever the language of the statute, the administrative determination is to be reviewed by the standard cited above—abuse of discretion—rather than after an analysis *de novo* of the administrative record. As noted above, there has been no abuse by PBGC of its discretion. Second, there has been no showing that the statutory amendment in question was in-

tended to do anything other than to make it clear that a slight or insubstantial deterioration in a plan's financial condition, or increase in PBGC's potential liability, should not justify termination. Here it is useful to recall that the amendment changed both clauses of the sentence describing financial conditions that would warrant termination, *i.e.*, the clause dealing with the plan's own financial condition and the clause dealing with potential liability of the PBGC fund. Both clauses were amended to insert a standard of reasonableness, presumably to assure that such day to day deviations as the normal vagaries of a plan's investments, for example, would not provide the occasion for a precipitous termination. Third, what PBGC thought was an acceptable risk in December 1990 or April 1991, when it was weighing whether to seek termination of the plans against the possibility that some satisfactory solution might be found for Pan Am's financial difficulties beyond the company's obligations to these plans, has no relevance to what is a "reasonable" potential liability now that it is clear there can be no assurance of such a solution.

■ Here, the record amply justifies PBGC's determination that the plans must be terminated to avoid a substantial increase in PBGC's own potential liability. A substantial increase in such potential liability, with no certain prospect that such potential liability can be recouped, should be regarded under this statute as unreasonable because the PBGC fund must be available to protect the minimally guaranteed benefits of the beneficiaries of all covered plans in the United States, not just the benefits of Pan Am employees. As was apparent at oral argument on November 20, the parties do not seriously dispute that the cost to PBGC of keeping the plans in effect, in present value terms, is $700,000 per month, arising principally from potential early retirement benefits liability under the Cooperative Retirement Income Plan. Wherever the line may be drawn to separate substantiality from insignificance, $700,000 per month is substantial.

■ The Pension Committee and the intervenors have argued also that in seeking to terminate these plans, PBGC has deviated from its own internal guidelines, which intervenors have attached as an exhibit to their October 25, 1991 memorandum, by failing to follow the guidelines applicable to distress terminations. Those guidelines are not mandated by statute or by the Constitution, and are for PBGC's own internal use; therefore, they do not have the force of law and create no substantive rights in favor of any party. *United States v. Craveiro*, 907 F.2d 260, 264 (1st Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 588, 112 L.Ed.2d 593 (1990), and cases cited therein.

But even if those guidelines did have the force of law, PBGC has adhered to them in this case. The guidelines at issue are in two parts, one relating to "distress terminations" and the other to involuntary terminations sought by PBGC. A distress termination may occur at the behest of a plan sponsor, and, without getting into unnecessary detail, the guidelines relating to such terminations seem directed at assuring that sponsors do not terminate plans precipitously. The guidelines relating to involuntary terminations exhort the agency to make every effort to obtain compliance with the guidelines relating to distress terminations, but this exhortation appears aimed at making certain that the plan sponsor provides information more readily accessible to that sponsor than to PBGC. In any event, even this hortatory provision contains an exception for the case where "extraordinary circumstances" exist. "Extraordinary circumstances" are defined to include circumstances when, during the time necessary to obtain a distress termination, "it is reasonable to expect, based on the facts, that PBGC's potential liability with respect to the plan will increase unreasonably." 10/25/91 Mem.Exh. A, p. 7. Such circumstances exist here, with liability accumulating at the rate of $700,000 per month.

II.

The real dispute in this case centers on the plan termination date. All parties

agree that, in the event of a dispute between the plan administrator and PBGC, the date is to be set by the court without the deference to the agency's determination that attends the decision on whether to terminate the plan. 29 U.S.C. § 1342(c). The Pension Committee and the intervenors have set out eloquently and at length the interests of the plan participants in continuing the plans, which they argue must be balanced against PBGC's interest in enforcing the July 24, 1991 termination date it seeks. They point out that additional benefits have long since ceased to accrue under these plans, and thus the only potential losses to PBGC from extending the life of the plans beyond July 24 will result from more participants becoming eligible to receive benefits which those participants had believed would become available to them in due course. The Pension Committee and the intervenors argue as well that many of the minimum benefits offered from the PBGC fund are the actuarial equivalent of more desirable benefits available to plan participants under the plans, but that the latter will not be available in the event of termination because the PBGC fund limits not only the actuarial value of minimum benefits but also their form.

■■■ Whatever I might think of these arguments in the abstract, I am constrained by governing authority in this Circuit which prescribes with some precision just how the balance is to be struck in selecting a termination date. In *In re Pension Plan for Employees of Broadway Maintenance Corp.*, 707 F.2d 647 (2d Cir. 1983), the Court endorsed the test first prescribed in *PBGC v. Heppenstall, supra,* for setting a termination date. 707 F.2d at 651–52. Notably, although *Heppenstall* antedated the statutory amendment discussed above, *Broadway Maintenance* followed that amendment. In any event, the Court in *Broadway Maintenance* described the correct procedure as follows:

> As in *Heppenstall* the District Court in this case should begin its analysis by determining the earliest date when the Plan's participants had actual or constructive notice of the Plan's termination,

*i.e.,* notice sufficient to extinguish their reliance interest, *see Heppenstall, supra,* 633 F.2d at 301–02. Once that date is ascertained, the District Court should then select whatever later date serves the interests of PBGC.

707 F.2d at 652–53. That is the procedure that must be applied here.

As the above passage from *Broadway Maintenance* shows, actual notice is not required; constructive notice will do. Constructive notice, however, is an elusive notion in this setting. PBGC argues that there was constructive notice to plan participants at the latest on July 24, 1991, when PBGC placed advertisements in the following eight newspapers disclosing its intention to seek termination of the plans: USA Today, Wall Street Journal, New York Times, New York Daily News, Boston Globe, Miami Herald, El Nuevo Herald (Miami), Washington Post. However, the standard PBGC seeks may well result in no notice at all if there is no reason to believe that plan members would have seen the advertisements at issue on the date they appeared. When one considers that constructive notice must be "sufficient to extinguish [the] reliance interest" of plan beneficiaries, *Broadway Maintenance,* 707 F.2d at 653, this is not a case in which to apply willingly the view that " 'constructive notice' often means no notice...." *Shacket v. Philko Aviation, Inc.,* 841 F.2d 166, 171 (7th Cir.1988) (Posner, J.). No case cited by counsel or disclosed by research has construed "constructive notice" as applied to a notice terminating a pension plan. However, because such notice operates to extinguish a plan beneficiary's reliance, simple fairness requires a definition of constructive notice that requires facts strongly suggesting that actual notice exists without requiring that actual notice be proved. "Constructive notice" has been defined at common law "to be in its nature no more than evidence of notice, the presumption of which is so violent that the court will not even allow of its being controverted." *Townsend v. Little,* 109 U.S. 504, 511, 3 S.Ct. 357, 361, 27 L.Ed. 1012 (1883). That definition is reasonably applied here.

Applying that definition in this setting, and considering the nature of the interest to be extinguished, the time of constructive notice should be the time when a potential plan beneficiary should have known there was a substantial chance that the plan on which that beneficiary had relied would be terminated. The advertisements in question, coupled with other notice provided by PBGC to interested parties, which in turn resulted in the sending of actual notice to Pan Am employees covered by the plans in question, generated correspondence to this court beginning in early August. It is apparent that word of the impending termination was out within a week of July 24 to anyone interested in hearing it, such that July 31 may be treated as the date when interested persons should have known of PBGC's petition—*i.e.*, the date of constructive notice.

\* \* \*

For the foregoing reasons, a decree of termination will issue and the termination date of the plans will be July 31, 1991.

SO ORDERED.