In re PENSION PLAN FOR EMPLOYEES OF BROADWAY MAINTENANCE CORPORATION.

PENSION BENEFIT GUARANTY CORPORATION, Plaintiff-Appellant,

v.

BROADWAY MAINTENANCE CORPORATION,
Defendant-Appellee.

No. 922, Docket 82–6274.

United States Court of Appeals,
Second Circuit.

Argued Feb. 14, 1983.

Decided May 2, 1983.

Mitchell L. Strickler, Washington, D.C. (Henry Rose, General Counsel, James N. Duncan, Asst. General Counsel, Lawrence F. Landgraff, Trial Atty., Angela J. Arnett, Atty., Pension Benefit Guar. Corp., Washington, D.C., on brief), for plaintiff-appellant.

Remy J. Ferrario, New York City (Shea & Gould, New York City, on brief), for defendant-appellee.

Before LUMBARD, OAKES and NEWMAN, Circuit Judges.

NEWMAN, Circuit Judge:

The Pension Benefit Guarantee Corporation (PBGC) appeals from the September 30, 1982, judgment of the District Court for the Southern District of New York (Kevin H. Duffy, Judge) setting a termination date for the Pension Plan for Employees of Broadway Maintenance Corporation (Plan). 547 F.Supp. 629 (S.D.N.Y.1982). The appeal presents issues requiring interpretation of the pension plan termination procedures established by Title IV of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1301–1461 (1976 & Supp. V 1981).

I.

Congress created PBGC to encourage the development of private pension plans and to ensure that plan participants receive the benefits promised by their employers. One of PBGC's statutory duties is to operate a mandatory insurance program that guarantees plan participants a certain minimum level of benefits if their employers terminate pension plans with inadequate funds.

Because plan termination can cause significant hardships for participants and substantial liabilities for PBGC, ERISA outlines permissible plan termination procedures in considerable detail. A plan administrator (often, as in this case, the employer) wishing to terminate a pension plan must follow the voluntary termination proceedings described in section 4041 of ERISA, 29 U.S.C. § 1341. First the plan administrator files a Notice of Intent to Terminate with PBGC. Then the administrator waits ninety days while the PBGC reviews the plan's financial records to make sure it has sufficient funds to cover the participants' accrued benefits. Once PBGC has determined the assets to be sufficient, the administrator is free to terminate the plan.

ERISA also permits PBGC to institute termination proceedings. Under section 4042 of ERISA, 29 U.S.C. § 1342, PBGC must initiate what are known as involuntary termination proceedings whenever it determines, according to specified criteria, that a plan's financial position has become untenable, see id. § 4042(a), 29 U.S.C. § 1342(a). Once PBGC finds a plan untenable, it applies to the appropriate federal district court to have the plan terminated and a trustee appointed to administer the plan's assets. See id. § 4042(b), (c), 29 U.S.C. § 1342(b), (c). Occasionally, a company initiates voluntary termination proceedings, and PBGC discovers in the course of its ninety-day review period that the plan's assets are insufficient.[1] In such cases, PBGC is obliged to begin involuntary termination proceedings under section 4042 of ERISA, 29 U.S.C. § 1342, in order to protect itself and the plan participants from suffering losses caused by the company's unfunded pension liability. Id. § 4041(c), 29 U.S.C. § 1341(c).

---

1. If PBGC cannot determine that the assets are sufficient, the same results obtain. See ERISA § 4041(c), 29 U.S.C. § 1341(c).

A plan's termination date is significant in both voluntary and involuntary termination proceedings. In both, termination marks the date on which the benefits of plan participants cease to accrue. For involuntary terminations, the date of termination serves an additional purpose. When an employer underfunds its pension plan and is unable to finance a minimum level of benefits, PBGC, pursuant to its statutory guarantee, must pay those benefits. *See* id. § 4022, 29 U.S.C. § 1322. If forced to honor its guarantee, PBGC has the right to recover from the employer the lesser of the amount that the employer underfunded its plan or thirty percent of the employer's net worth on a date chosen by PBGC within 120 days prior to the plan's termination date. *See id.* § 4062(b), 29 U.S.C. § 1362(b). Because involuntary termination proceedings often involve bankrupt corporations with deteriorating financial resources, *see, e.g., In re Braniff Airways, Inc.,* 21 B.R. 181 (Bkrtcy. N.D.Tex.1981) (*Braniff I*), the date of termination can significantly affect the extent of PBGC's recovery from the employer. A late termination date may prevent PBGC from having any claim against an employer with little or no net worth during the 120 days before the termination date. On the other hand, an early termination date could give PBGC the right to recover substantial assets from the employer, based on its higher net worth at an earlier time.

In devising a mechanism for setting a termination date, Congress expressed a clear preference that a termination date be set in advance to give plan participants warning when their benefits will stop accruing. Accordingly, in voluntary termination proceedings, a plan administrator must propose a termination date at least ten days after the date on which the Notice of Intent to Terminate is filed. *See* ERISA, § 4041(a), 29 U.S.C. § 1341(a). Although it favored prospective termination dates, Congress did not require PBGC to give formal advance notice to plan participants in all involuntary termination proceedings. Congress apparently recognized that, when faced with bankrupt employers and substantial unfunded pension liabilities, PBGC might occasionally wish to establish a retroactive date of termination to limit its own liability. *See id.* § 4048(a)(2), 29 U.S.C. § 1348(a)(2). But Congress did not give PBGC unilateral authority to set a termination date, even in involuntary proceedings. Under ERISA, if the plan administrator does not agree to the date proposed by PBGC in an involuntary termination proceeding, a federal district court will set the date. *Id.* § 4048(a)(3), 29 U.S.C. § 1348(a)(3). Similarly, PBGC can request the Court to set a termination date if it does not approve of the date proposed by the employer in a voluntary termination proceeding. *Id.*

## II.

In September 1973, the Broadway Maintenance Corporation, engaged in the business of street light maintenance in Manhattan and the Bronx, established a pension plan for its employees. Over the next five years, Broadway made several contributions to the Plan, but not the number nor the total amount of dollars that the Plan required. On July 19, 1978, the company filed a petition in bankruptcy under Chapter XI of the old Bankruptcy Act. Broadway officials mistakenly believed that their bankruptcy filing terminated the company's pension plan, and did not realize that they had to file a Notice of Intent to Terminate with PBGC before terminating the Plan. PBGC first learned in August 1980 that Broadway wished to terminate its Plan when a Broadway employee contacted the agency about the Plan's coverage. Through subsequent investigation, PBGC discovered that Broadway's Plan was seriously underfunded and that the company was in bankruptcy proceedings. Recognizing that it might soon have to assume responsibility for Broadway's pension liabilities, PBGC filed two Proofs of Claim in bankruptcy court: one on behalf of the Plan for the contributions that Broadway should have made over the past seven years under the terms of the Plan and under section 4042(d)(1)(B)(ii) of ERISA, 29 U.S.C. § 1342(d)(1)(B)(ii), and the other on its own behalf for the expected

liability of the company to PBGC under section 4062(b) of ERISA, 29 U.S.C. § 1362(b), as a result of the Plan's imminent termination. In statements submitted to the bankruptcy court, PBGC revealed that it planned to initiate involuntary termination proceedings against Broadway. PBGC's Proofs of Claim and its accompanying statements were filed on December 5, 1980.

In early 1981, officials from Broadway and PBGC met to discuss the termination of the Plan. On March 20, 1981, Broadway filed with the PBGC a Notice of Intent to Terminate, proposing a retroactive termination date prior to December 31, 1979. Ordinarily, this Notice would have proposed a date of termination no earlier than ten days after the date the Notice was filed. *See* ERISA § 4041(a), 29 U.S.C. § 1341(a). PBGC, however, has indicated that it will "in unusual cases" accept retroactive termination dates. *See* 45 Fed.Reg. 80,941, 80,-942 (Dec. 8, 1980). In a cover letter attached to Broadway's Notice of Intent, counsel for the company expressed his understanding that PBGC had already agreed that Broadway's application was sufficiently unusual to warrant a retroactive date of termination.

PBGC officials did not share the understanding of Broadway's counsel and refused to accept the retroactive termination date, as would have been necessary for the proposed date to take effect. *See* ERISA § 4048(a)(1), 29 U.S.C. § 1348(a)(1). The earliest termination that PBGC would accept was March 30, 1981, which was ten days after March 20, 1981, the day that Broadway filed its Notice with PBGC. PBGC subsequently initiated this action requesting that Broadway's pension plan be terminated, that PBGC be appointed trustee of the Plan, and that March 30, 1981, be set as the date of termination. Broadway acquiesced to PBGC's first two requests, but maintained that the company's proposed retroactive termination date was appropriate. The date of termination was thus the sole issue before the District Court.

In resolving the parties' dispute over a termination date, the District Court first reasoned that the termination of Broadway's Plan was involuntary because PBGC rather than Broadway had instituted the termination proceedings. The District Court then looked to a recent Third Circuit case concerning selection of a plan termination date, *PBGC v. Heppenstall Co.,* 633 F.2d 293 (3d Cir.1980), and, endeavoring to follow the rationale of *Heppenstall,* fashioned the following test for setting a date of termination:

> When presented with a petition for involuntary termination, the termination date shall be the *earlier* of (1) ten days past the date the employer submits its Notice of Intent to Terminate (in this case March [30], 1981), (2) the date the [PBGC] first recognizes the need for termination and is in a position to so notify the plan participants, or (3) the date the employer actually notifies all plan participants of the plan's termination.

547 F.Supp. 632–33 (emphasis in original, footnote deleted). Because Broadway never formally notified its employees that its Plan was terminated, the only question the District Court thought necessary to decide was whether PBGC had recognized the need for termination before March 30, 1981. The Court concluded that PBGC was aware of the plan's inevitable termination at least as early as December 5, 1980, when it filed its Proofs of Claim with the bankruptcy court. The District Court therefore selected December 5, 1980, as the appropriate date of termination.

### III.

PBGC's basic claim on this appeal is that the District Court erred in its initial conclusion that the termination of Broadway's Plan was involuntary. According to PBGC, by filing a Notice of Intent to Terminate under section 4041 of ERISA, 29 U.S.C. § 1341, Broadway instituted a voluntary termination proceeding. PBGC claims that, even though it later brought the matter into court under section 4042(c) of ERISA, 29 U.S.C. § 1342(c), the termination retained its voluntary character. *See In re*

Syntex Fabrics, Inc., 698 F.2d 199 (3d Cir. 1983). *But see PBGC v. Dickens,* 535 F.Supp. 922, 925 (W.D.Mich.1982); *In re Braniff Airways, Inc.,* 24 B.R. 466 (Bkrtcy. N.D.Tex.1982) (*Braniff II* ). PBGC contests the District Court's designation of the termination proceeding as involuntary because that designation affects the selection of a termination date. In an involuntary proceeding, PBGC must propose a termination date, which the administrator can then reject, thereby leaving the selection of a date to the District Court. *See* ERISA § 4048(a)(2), 29 U.S.C. § 1348(a)(2). In a voluntary termination, however, PBGC can set the date by accepting the termination date proposed by the plan administrator in the Notice of Intent to Terminate. *See id.* § 4048(a)(1), 29 U.S.C. § 1348(a)(1). In PBGC's view, Broadway's March 20, 1981, Notice of Intent to Terminate, though requesting a retroactive date, implicitly proposed a date ten days later (the minimum notice period permitted by ERISA for a voluntary termination), and gave PBGC the right to "accept" March 30, 1981, as the date "proposed" by Broadway. In the District Court's view, PBGC's complaint commenced an involuntary termination and the March 30, 1981, termination date was simply PBGC's proposal, which Broadway was free to reject.

■■■ We agree with PBGC and the Third Circuit, *see In re Syntex Fabrics, Inc., supra,* that once a company initiates a voluntary termination proceeding, the proceeding remains voluntary and the company is bound by its proposed termination date if PBGC elects to accept that date. We further agree with PBGC that a notice of voluntary termination of a plan that expressly proposes a retroactive termination date should be considered implicitly to propose in addition a date ten days after the date of the notice, the minimum statutory

notice period.[2] However, we do not believe that Broadway's termination was voluntary. Broadway filed its Notice of Intent to Terminate only after PBGC had filed its Proofs of Claim against Broadway in the bankruptcy court and had announced its plans to institute involuntary termination proceedings against Broadway. Threatened with PBGC's action, Broadway filed a Notice of Intent to Terminate. Under these circumstances,[3] we do not believe that it would be fair to conclude that Broadway initiated a voluntary termination proceeding, particularly when the sole effect of such a conclusion would be to bind Broadway to an implied date of termination that it clearly did not intend to propose. When an employer proposes a truly voluntary termination, there is no unfairness in holding it to have impliedly proposed a termination date ten days following its notice, since it always had the option to propose an earlier date by filing its notice at an earlier time. But when a notice is filed under threat of PBGC initiation of an involuntary termination, that option was not realistically available. Indeed, if Broadway had thought that its notice would be deemed to be notice of a voluntary termination, it could have avoided the implied "proposal" of a date ten days after the notice by declining to file any notice, awaiting PBGC's notice of involuntary termination, and rejecting PBGC's proposed date, thereby submitting the date selection issue to the District Court. We therefore rule that the District Court was correct in treating this action as an involuntary termination proceeding, thereby requiring the Court to resolve the dispute as to the termination date.

We do not agree, however, that the District Court correctly extracted from *PBGC v. Heppenstall, supra,* an appropriate test for setting a termination date in an invol-

2. In such circumstances, PBGC would have the option of either accepting the implicitly proposed date of ten days after the notice, or accepting the expressly proposed earlier date selected by the employer, or rejecting both dates and submitting the issue of date selection to the district court.

3. Whether or not justifiably, Broadway's cover letter attached to its Notice of Intent to Terminate shows that the company, in filing the Notice, was relying on what it perceived to be PBGC's assurance that the retroactive termination date proposed in the Notice would be acceptable to the agency.

untary proceeding in which the plan administrator has rejected PBGC's proposed date. In *PBGC v. Heppenstall* PBGC had instituted involuntary termination proceedings, and the trial court had ordered termination. The trial court then ruled that, as a matter of law, the date of termination should be the date of its final judgment. PBGC appealed on the ground that the trial court's termination date imposed excessive liability on PBGC, which would be liable for the pension benefits that accrued during the trial and up to the date of final judgment. The Third Circuit agreed with PBGC, and said, "[T]ermination should be adjudicated 'in order to protect deterioration in the financial condition of the plan or any further increase in the liability of the (PBGC) fund.'" 633 F.2d at 300 (quoting ERISA § 4042(c), 29 U.S.C. § 1342(c)). The Court of Appeals reasoned that the trial court had erred by maximizing the interest of plan participants, who accrue more benefits the later the date of termination, without taking into account the statutory purpose of protecting the PBGC from unwarranted increases in liability. The Court of Appeals concluded that the earliest appropriate date of termination was the date on which employees had notice of a proposed termination and that any later date would be appropriate only in the unlikely event that PBGC would not face a risk of increased liability if the plan was terminated at a later date. The Court of Appeals remanded the case to the trial court to determine when the participants had notice of termination.[4]

■ *Heppenstall* established, correctly we believe, that a district court should consider only two factors when setting a termination date in an involuntary termination proceeding: the expectations of partici-

pants and the financial implications of termination for PBGC. As the Third Circuit has repeatedly emphasized, the financial interests of the employer should play no role in setting a termination date in these proceedings. *PBGC v. Heppenstall, supra,* 633 F.2d at 300–01; *see In re Syntex Fabrics, Inc., supra,* 698 F.2d at 204.

■ In *Heppenstall,* PBGC favored an early termination date (to lessen its financial exposure) and the plan participants favored a later date (to assure at least that termination would not precede notice to them of termination and to increase their accrued benefits). With the relevant interests thus arrayed, the Third Circuit accommodated these interests by authorizing a termination date no earlier than the date the employees had notice of termination and no later than the time beyond such date when the financial exposure of the PBGC would increase. In this case, however, the relevant interests are arrayed somewhat differently, due to the bankruptcy proceeding. Here, though the interests of the Broadway Plan participants favor a later date, for reasons not entirely clear from the record it is to the advantage of PBGC, as a claimant in the bankruptcy proceeding (both for itself and on behalf of the Plan), also to favor a later termination date,[5] at least a date later than either December 31, 1979, which was the latest date proposed by the Plan administrator, or December 5, 1980, which was the date selected by the District Court.

As in *Heppenstall* the District Court in this case should begin its analysis by determining the earliest date when the Plan's participants had actual or constructive notice of the Plan's termination, *i.e.,* notice

---

4. The employer in *Heppenstall* had ceased operations before the district court's final judgment, and the Third Circuit concluded that cessations of operations provided the employees with constructive notice of plan termination. The matter was nevertheless remanded to the district court for a determination whether the employees had notice even before operations ceased.

5. PBGC has not explained why selection of a later termination date improves its financial position in the bankruptcy proceeding, and it may well be that at some point a termination date set after passage of an extended period of time would inure to PBGC's detriment. All we are told is that selection of March 30, 1981, as the termination date benefits PBGC by approximately $2,700 more than selection of December 5, 1980, the date picked by the District Court.

sufficient to extinguish their reliance interest, *see Heppenstall, supra,* 633 F.2d at 301–02. Once that date is ascertained, the District Court should then select whatever later date serves the interests of PBGC. In *Heppenstall* the Third Circuit permitted a later date (to benefit the participants) only if the interests of PBGC were not adversely affected, since in that case selection of a later date could be expected at best to leave PBGC's interests unimpaired and at worst to injure those interests. In this case, however, due to the bankruptcy proceeding, the selection of a later date (up to a point) benefits PBGC. Therefore, it is appropriate for the District Court to select whatever date, after the participants have had notice, inures to the benefit of PBGC. Since PBGC has proposed March 30, 1981, the District Court is entitled to conclude that this date adequately serves the interests of PBGC. Therefore, on remand, the District Court should select March 30, 1981, as the termination date unless the Plan participants did not receive notice of termination until a later date, in which event the date when they received such notice should be selected as the termination date.

We realize that our decision will allow a termination date to be set without taking into consideration the costs imposed on Broadway and its creditors. But this result seems to be one that ERISA requires. Had Broadway or its creditors wished to escape this result, they could have initiated voluntary termination proceedings at any time. By failing to do so, they lost the chance of having their interest factored into the setting of a date of termination for the Plan.

Reversed and remanded for further proceedings.