**PENSION BENEFIT GUARANTY CORPORATION, Plaintiff–Appellee,**

v.

**MIZE COMPANY, INCORPORATED; Velma C. Rothwell; William Rothwell, Sr., Administrators of Retirement Plan for Employees of Mize Company, Incorporated, Defendants–Appellants.**

No. 92–1351.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 26, 1992.

Decided Feb. 25, 1993.

Margaret Behringer Maloney, Moore & Van Allen, Charlotte, NC, argued (C. Wells Hall III, Charles E. Johnson, on brief), for defendants-appellants.

James J. Armbruster, Office of the Gen. Counsel, Pension Benefit Guar. Corp., Washington, DC, argued (Carol Connor Flowe, Gen. Counsel, Jeffrey B. Cohen, Deputy Gen. Counsel, Valerie R. Dinkins, Asst. Gen. Counsel, David J. Gzesh, Mary K. Bentley, Office of the General Counsel, Pension Benefit Guar. Corp., Washington, DC; James M. Sullivan, Asst. U.S. Atty., Charlotte, NC, on brief), for plaintiff-appellee.

Before HALL, WILKINSON, and LUTTIG, Circuit Judges.

## OPINION

K.K. HALL, Circuit Judge:

Mize Company, Inc., appeals the district court's summary judgment order establishing a termination date for the company's pension plan. We affirm.

### I.

Mize, a small North Carolina company, established a pension plan for its employees in 1954. The plan was to be funded through a group annuity contract with Life Insurance Company of Virginia. In 1974, the Employee Retirement Income Security Act (ERISA), Pub.L. 93–406, 88 Stat. 832, was enacted. Tony Harris, Mize's owner from 1972–82, was informed by Life Insurance that ERISA mandated certain amendments to the pension plan. Harris responded on May 3, 1976, that he intended to terminate the pension plan and to establish a profit sharing plan in its stead. However, despite being explicitly advised to do so by Life Insurance in May, 1976, Harris never notified the Pension Benefit Guaranty Corporation (PBGC) of the plan termination, as was required under § 4041(a) of Title IV.[1]

Harris sold the company to Verna Rothwell in 1982. The company ceased operations on July 3, 1985, and was liquidated. In 1989, a former Mize employee attempted to secure his pension, but Rothwell directed Life Insurance to refuse payment. On June 21, 1991, PBGC applied to the district court for an order requiring Mize to show cause why the plan should not be terminated effective July 3, 1985; the application also prayed that PBGC be appointed statutory trustee of the plan and that all plan records and assets be delivered to PBGC.

Mize objected to only the proposed termination date of July 3, 1985. The company

1. Section 4041(a) reads as follows:
 (a) Filing of notice that plan is to be terminated
 Before the effective date of the termination of a single-employer plan, the plan administrator shall file a notice with the corporation that the plan is to be terminated on a proposed date (which may not be earlier than 10 days after the filing of the notice), and for a period of 90 days after the proposed termination date the plan administrator shall pay no amount pursuant to the termination procedure of the plan unless, before the expiration of such period, he receives a notice of sufficiency under subsection (b) of this section. Upon receiving such a notice, the plan administrator may proceed with the termination of the plan in a manner consistent with this subtitle.

argued that the proper date was December 31, 1975, allegedly the latest date by which all of Mize's employees had been told by then-owner Harris that the pension plan was being terminated and that no future benefits would accrue.[2] In support of this earlier date, Mize filed an affidavit by Harris in which he stated that "all employees who were participants in the Plan were notified by me either in letter or in person that the Plan was being terminated."

The district court granted the relief requested by PBGC. Noting that there was no dispute about Mize's failure to follow the statutory termination requirements, the court ruled that the proposed 1975 or 1976 dates could not be used. July 3, 1985, was chosen as the termination date because, as the court explained, the employees would be deemed to have had constructive notice that their benefits would cease to accrue when the company closed down operations.

Mize appeals.

## II.

Mize complains that the district court erred in granting summary judgment in the absence of a motion by PBGC and without an evidentiary hearing. This argument is meritless.

A district court has the power to grant summary judgment *sua sponte. U.S. Development Corp. v. Peoples Fed. Sav. & Loan*, 873 F.2d 731, 735 (4th Cir. 1989). The district court gave Mize ample opportunity to respond to PBGC's complaint; discovery was conducted, extensions were granted, and Mize filed at least two pleadings, with accompanying memoranda of law, objecting to PBGC's application. Mize has yet to identify a genuine issue of material fact that is in dispute. Although PBGC, in its briefs to this court, takes issue with two factual allegations by Mize, neither is material.[3] We are unable to envision what additional facts Mize would attempt to show were we to vacate

the judgment below and remand for further proceedings.

## III.

PBGC was established in 1974 as a wholly-owned government corporation for the purpose of administering the single-employer pension plan termination insurance program. Under this insurance program, PBGC guarantees the payment of certain minimum pension benefits to pension plan participants in the event that a covered plan terminates with insufficient assets to pay the benefits. 29 U.S.C. §§ 1302(a)(2), 1322 and 1361. Funding for the program comes from four basic sources: (1) insurance premiums paid by employers who are maintaining ongoing covered plans (29 U.S.C. § 1306); (2) liability payments collected from employers upon plan terminations (29 U.S.C. § 1362); (3) assets acquired from terminated plans; and (4) earnings on investments. General funds of the Treasury are not used. 29 U.S.C. § 1302(g)(2).

A plan can be terminated in one of three ways. If a plan has sufficient assets to cover all benefit liabilities, an employer may pursue a "standard termination." 29 U.S.C. § 1341(b). In the case of a plan that does not have sufficient assets to cover accrued liabilities, an employer may seek a "distress termination" under 29 U.S.C. § 1341(c). Under either form of these voluntary termination routes, an employer must file with PBGC a notice of intent to terminate at least sixty days prior to the proposed termination date. 29 U.S.C. § 1341(a)(2), (c)(1). After it receives notice of the proposed termination, PBGC has 60 days (longer if extended by agreement) to determine if the termination requirements have been met. This 60–day period is designed to, among other things, enable PBGC to evaluate the fiscal soundness of the plan.

---

**2.** Mize also proposed December 31, 1976, as an alternative, this being the date through which pension benefits were allegedly fully funded.

**3.** These two factual disputes are (1) whether Harris gave actual notice of his planned plan termination to all employees, and (2) whether the plan was fully funded as of December 31, 1976.

In addition to the voluntary termination routes, ERISA provides for an involuntary termination process. 29 U.S.C. § 1342. Whenever PBGC determines that a plan will be unable to pay benefits when due, it may institute court proceedings to obtain "a decree adjudicating that the plan must be terminated to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund." 29 U.S.C. § 1342(c). Under this procedure, a trustee may be appointed by the court to administer the plan. 29 U.S.C. § 1342(b).

In many cases, the extent of a plan's deficiencies hinges largely on the date of termination. *See PBGC v. Heppenstall Co.*, 633 F.2d 293, 297 (3d Cir.1980) (explaining various ways in which PBGC's exposure depends on termination date). In a standard termination, the prospective date proposed in the plan administrator's termination notice is used. 29 U.S.C. § 1348(a)(1). In a distress or involuntary termination, PBGC (or the trustee, if any) and the plan administrator can agree on a date; absent an agreement, however, the date of termination is established by the district court. 29 U.S.C. § 1348(a)(4). Unfortunately, Congress gave the court no express direction on how such a date should be determined. This lacuna in the statutory scheme is the subject of this action.

### IV.

 It is undisputed that Harris failed to follow the requirements for a standard termination of Mize's plan, and Mize is not arguing that a voluntary termination was effected when Harris notified his employees in 1975 of his intentions to switch from a pension plan to some sort of profit-sharing plan. Mize's only complaint is that the district court misapplied the standard developed in other circuits for setting the date for an involuntary termination. We believe that the district court used the proper standard and applied it correctly. Important policy considerations also buttress the choice of the 1985 termination date.

The Third Circuit considered the issue in *Heppenstall,* 633 F.2d 293. Noting the absence of any explicit statutory direction or evidence of legislative intent regarding the selection of a termination date, the court decided that it "must select the date which it determines is most consistent with the purposes of the insurance subtitle [29 U.S.C. § 1301 et seq.]." *Id.* at 297. These purposes are those given for the adjudication of an involuntary termination in § 1342(c): "... to protect the interests of the participants and to avoid any further deterioration of the financial condition of the plan or any further increase in the liability of the fund." *Id.* at 300. The court then dissected the respective interests of participants and PBGC; the interests of the employer were deemed to be of no consequence. *Id.* at 300–01.

PBGC's interest as a self-financing mutual insurer is to protect its fund and the other plans that pay into the fund in the form of termination premiums. *Id.* The participants' interest was deemed to be one of expectation or reliance; in other words, participants should be protected until the earliest date on which they received some notice of termination that they no longer had any "reasonable expectation in the accrual of vested pension rights." *Id.* at 302. The cessation of a company's operations would constitute sufficient constructive notice that no benefits would continue to accrue, and such date would, therefore, be the latest possible termination date. *Id.* at 301–02. Thus, the range of possible dates is bracketed by the dates of two events: actual notice to the participants and cessation of company activities.

The concept of employee expectations in the context of an involuntary termination proceeding was developed more fully a few years later in *PBGC v. Broadway Maintenance Co.*, 707 F.2d 647 (2d Cir.1983). In this case, both the participants and PBGC favored later (though different) termination dates than that selected by the district court. The appeals court, however, modified the *Heppenstall* balancing test somewhat to assign a new role to the earliest date on which the "participants had actual or constructive notice of the Plan's

termination, i.e. notice sufficient to extinguish their reliance interest." 707 F.2d at 652–53.

Instead of merely balancing the employees' reliance interests and PBGC's financial interests in the overall insurance fund, the *Broadway Maintenance* court established a two-step test: (1) select the earliest date on which participants had notice of termination, and (2) "then select whatever later date serves the interests of PBGC." *Id.* This test is based on two assumptions: (1) that the reliance interests of the participants will never be diminished by the selection of a post-notice date, and (2) that the date selected by PBGC adequately protects PBGC's interests.

A third interest should inform our analysis. The statutory provisions governing terminations of single-employer plans are exclusive. "Strict compliance with the statute is the sole means by which a pension plan subject to ERISA may be terminated." *Phillips v. Bebber,* 914 F.2d 31, 34 (4th Cir.1990) (voluntary termination). While selection of a termination date is a matter distinct from the termination itself, the two are intertwined. The statutory scheme and the PBGC regulations (29 C.F.R. § 2601 et seq.) comprise a fairly extensive set of requirements aimed at protecting plan participants, and allowing employers to effectively achieve the benefits of a termination without following these requirements would serve to undermine the very purpose for the insurance program's existence.

The 1986 amendments to ERISA were prompted in large part by the alarming number of insufficient terminations and the magnitude of the insufficiencies in the single-employer program. *See* H.R.Rep. No. 241, 99th Cong., 2d Sess., at 28–29, reprinted in 1986 U.S.Code Cong. & Admin.News 42,685–686. Among the specific problems cited by Congress were some companies' attempts to evade liability for pension promises by transferring unfunded benefits to weaker companies. *Id.* Although there is no indication that Mize sought to evade liability by transferring pension benefits elsewhere, acceptance of Mize's proposed date would limit PBGC's recourse to plan sponsors and their controlled group as they existed in 1975. 29 U.S.C. § 1362(a).

## V.

Mize attempts to enhance the significance of the first *Heppenstall* factor, the employees' expectation interest. Instead of the notice date merely acting as the early end of the range of possible termination dates, Mize argues that "[t]he appropriate date for plan termination is generally the *earliest* date by which participants had notice that they could no longer expect the accrual of vested benefits." Appellants' Brief at 13 (emphasis in original). This argument relegates the other interests we have identified above to minor, if not non-existent, roles.

For the purposes of the summary judgment motion, we must assume that the facts alleged by Mize are true. The central facts alleged are that Harris notified every Mize employee by the end of 1975 that the pension plan was being terminated and that the plan was "fully-funded" through the end of 1976. Mize would have us end the inquiry at this point.

PBGC's interests should be deemed to be best served by the date proposed by PBGC. *See Broadway Maintenance,* 707 F.2d at 653. ("[T]he district court is entitled to conclude that this date [selected by PBGC] adequately serves the interests of PBGC.") Mize contends that its proposed 1976 date, a point at which the plan was fully funded and after which no further benefits would accrue, would completely serve PBGC's interests because selection of this date would entail no financial burden on the insurance fund whatsoever. What Mize is really saying is that picking the earlier date would entail no burden on Mize, the plan sponsor, or on its controlled group. As we have noted above, the effect of a termination date on the employer is of no legal consequence, and that a plan may or may not be fully funded at some post-notice point strikes us as irrelevant. *See id.* at 652. Mize does not suggest that the pension liabilities accrued on the basis of the 1985 date selected cannot be collected from the sources made available for such purpose by statute. *See* 29 U.S.C. § 1362(a). PBGC's expertise should be deferred to, at least to the extent of determining its own best interests.

The final interest, implicit in the earlier cases, is that of fostering compliance with the statutory termination scheme. If extinguishing the employees' reliance interest is all that it takes to set a termination date, there would appear to be little or no incentive to follow the notice procedures in § 1341. Though no formal termination would be effected until the PBGC-instituted involuntary proceeding was completed, the effect on Mize's liability would essentially be the same as if a voluntary termination had been properly accomplished in 1975 or 1976. The persons liable to the PBGC and to the trustee for fund deficiencies, i.e. any contributing sponsor of the plan or a member of such a contributing sponsor's controlled group, are determined as of the termination date. 29 U.S.C. § 1362(a). Moreover, the net worth of the persons subject to such liability are determined in the 120–day period ending with the termination date. 29 U.S.C. § 1362(d)(1)(C).

Mize does not argue that it was unaware of the statutory provisions governing standard terminations. In 1976, Harris was expressly warned by letter from Life Insurance that ERISA mandated prior notice to PBGC before the plan could be terminated and that no pension benefits could be paid out until a notice of sufficiency had been obtained from PBGC. Nevertheless, Harris chose to ignore these warnings. Now, some sixteen years later, Mize asks us to rule that, *in effect,* a voluntary termination occurred in 1975 or 1976 and that the company's liabilities should be determined as of that date. To so rule would send the following message to all single-employer fund administrators: Don't worry about all those bothersome rules. If you want to halt benefits accrual and end your pension plan, just go around the shop or factory or office and tell your employees that they better not count on building up their pensions from that point forward. Then, when PBGC finally finds out (and that could take years), the company can say there was no need to notify per the statute because all that matters is when the participants' "expectation interests" were extinguished. In the interim, however, assets of the plan sponsor and the controlled group may have gone south, leaving little for PBGC to look to. By avoiding PBGC scrutiny at the outset, the company is free to use assets that might otherwise be collected by the PBGC or court-appointed trustee. *See Heppenstall,* 633 F.2d at 300. ("[A]n employer whose business is losing money has no incentive to arrive at a prompt determination date, since as its net worth shrinks its liability to PBGC shrinks as well.")

We emphasize the importance of strict adherence to termination procedures and the irrelevance of the effect of a termination date on the employer. The length of time involved in this case further militates against the selection of a date in the mid–1970s. We are wary of establishing a standard that will sanction, if not encourage, disregard of the termination statute. The involuntary procedure will not be permitted to regress to a proceeding in which an employer may obtain the advantages of an early termination date through proof of actual notice to employees some time in the past. In short, we reject Mize's plea for a one-step test that would look only to the date on which employees were notified, and we expressly adopt the test enunciated in *Broadway Maintenance.*

AFFIRMED.