RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 04a0339p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PENSION BENEFIT GUARANTY CORPORATION,
                                        *Plaintiff-Appellant,*

             *v.*

REPUBLIC TECHNOLOGIES INTERNATIONAL, LLC, et al.,
                                        *Defendant,*

UNITED STEELWORKERS OF AMERICA, AFL-CIO, CLC,
                                        *Defendant-Appellee.*

No. 03-4494

---

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 02-01116—Peter C. Economus, District Judge.

Argued: August 11, 2004

Decided and Filed: October 1, 2004

Before: BATCHELDER and GIBBONS, Circuit Judges; STAFFORD, District Judge.[*]

---

## COUNSEL

**ARGUED:** Susan E. Birenbaum, PENSION BENEFIT GUARANTY CORPORATION, Washington, D.C., for Appellant. Lonie Anne Hassel, GROOM LAW GROUP, Washington, D.C., for Appellee. **ON BRIEF:** Susan E. Birenbaum, William G. Beyer, Roger Reiersen, Ralph L. Landy, PENSION BENEFIT GUARANTY CORPORATION, Washington, D.C., for Appellant. Lonie Anne Hassel, GROOM LAW GROUP, Washington, D.C., David R. Jury, UNITED STEELWORKERS OF AMERICA, Pittsburgh, Pennsylvania, for Appellee.

---

## OPINION

---

JULIA SMITH GIBBONS, Circuit Judge. In this appeal plaintiff-appellant Pension Benefit Guaranty Corporation ("PBGC") seeks review of the district court's denial of a plan termination date that would permit PBGC to avoid payment of $95 million in unvested "shutdown" benefits to plan participants represented by defendant-appellee United Steelworkers of America ("USWA"). The appeal presents no

---

[*] The Honorable William Stafford, United States District Judge for the Northern District of Florida, sitting by designation.

issue as to the propriety of termination of the relevant benefit plans, which termination will result in the participants' receipt of $100 million in retirement benefits that they would not otherwise receive in the absence of PBGC's termination of the plans and guarantee of the benefits vested under them. PBGC's obligation to pay these vested benefits arose after the participants' employer Republic Technologies International, LLC ("RTI") declared bankruptcy and was unable to pay benefits under the plans.

PBGC initiated involuntary termination proceedings against four defined benefit plans administered by RTI after RTI filed its petition for bankruptcy pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 1101-1174. Two of the plans cover 6,027 participants represented by the USWA. These plans included provisions for shutdown benefits, which would allow eligible participants to receive an immediate unreduced early retirement benefit in the event of a permanent shutdown of one or more of RTI's facilities. The shutdown benefits were not funded or vested at the time of their negotiation. During the bankruptcy proceedings, RTI agreed to sell substantially all of its assets to a new company that had expressed an intention to hire 2,500 of RTI's 4,000 employees, but this new company did not want to assume responsibility for the pension plans. The USWA reached an agreement with RTI in April 2002, specifying that the sale of RTI's assets to the new company would constitute a "shutdown" under the plans, thereby triggering the provisions for shutdown benefits.

In the course of carrying out its statutory obligations under 29 U.S.C. § 1302(a), PBGC became concerned about the potential impact of the proposed sale on the plans and on its own financial condition. On June 12, 2002, PBGC issued notices pursuant to 29 U.S.C. § 1342(c), indicating its intent to terminate the plans, to seek its appointment as statutory trustee, and to have June 14, 2002, established as the date of plan termination. PBGC sought an immediate termination date in order to prevent the vesting of the shutdown benefit provisions that would occur with the closing of the sale of RTI's assets. PBGC also filed a complaint against RTI in federal district court for the Northern District of Ohio, seeking termination of the plans, appointment as statutory trustee, and June 14, 2002, as the date of plan termination. The USWA was later granted leave to intervene as a party defendant. On cross motions for summary judgment, the USWA opposed only the proposed date of plan termination and asked the district court to establish a termination date of August 17, 2002 – the day after the closing of the asset sale. The court found that the plan participants had a "heightened" reliance interest in the receipt of shutdown benefits and that PBGC had failed to demonstrate that a plan termination date of June 14, 2002, adequately protected its insurance fund from an unreasonable increase in liability. It established August 17, 2002, as the date of plan termination, and PBGC has appealed. We conclude that any reliance interest the plan participants had in the receipt of shutdown benefits was extinguished the day PBGC sent out the notices of termination. We also conclude that the district court failed to adhere to the governing statutory purpose and persuasive case authority and thus gave no deference to PBGC's determination that it faced an unreasonable increase in its liabilities if the court selected a termination date after "shutdown." Therefore, we reverse.

## I.

Before turning to the facts of this particular case, some background on the role that PBGC plays in our nation's pension benefit insurance system is necessary. PBGC is a federal corporation that was established by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1301-1461 ("ERISA") for the purpose of administering the single-employer pension plan termination insurance program. PBGC's insurance program currently protects the pensions of approximately 44 million working men and women in slightly more than 35,000 private defined benefit pension plans. In fiscal year 2002, PBGC paid over $2.5 billion in benefits to almost 459,000 people. Under this insurance program, PBGC guarantees the payment of certain minimum pension benefits to pension plan participants in the event that a covered plan terminates with insufficient assets to pay the benefits in full. 29 U.S.C. §§ 1302(a)(2), 1322, and 1361. PBGC receives no funds from general tax revenues. Its operations are financed using income from four basic sources: (1) insurance premiums set by Congress and paid by sponsors of defined benefit plans, (2) investment income, (3) assets in terminated plans, and (4) recoveries, if any, from employers whose underfunded plans have terminated. *See also* 29 U.S.C. §§ 1302(g)(2), 1306, and 1362.

PBGC operates under the guidance of its Board of Directors, which is composed of the Secretaries of Labor, Commerce, and the Treasury. PBGC's mission is to protect participants' pension benefits and to support a healthy retirement plan system by: (1) encouraging the continuation and maintenance of voluntary private pension plans for the benefit of their participants, (2) providing timely payments of benefits in the case of terminated pension plans, and (3) making the maximum use of its resources while at the same time maintaining premiums at the lowest levels consistent with its statutory responsibilities. 29 U.S.C. § 1302(a)(1)-(3).

If a plan terminates with insufficient assets to pay guaranteed benefits, PBGC typically becomes trustee of the plan, takes over the assets and liabilities of the plan, and pays benefits to plan participants. 29 U.S.C. §§ 1322, 1342(d)(1), and 1361. ERISA provides for both voluntary termination by the plan administrator and involuntary termination by PBGC. Involuntary termination procedures may be instituted when PBGC determines that the plan is unable to pay benefits when due, 29 U.S.C. § 1342(a)(2), and when PBGC faces an unreasonable increase in liabilities with respect to the plan if the plan is not terminated. 29 U.S.C. § 1342(a)(4). If PBGC determines that a plan will be unable to pay benefits when due, it may institute court proceedings to obtain "a decree adjudicating that the plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund." 29 U.S.C. § 1342(c).

A plan's termination date is significant because it marks the date on which benefits for plan participants cease to accrue. *Pension Benefit Guaranty Corp. v. Broadway Maint. Corp.*, 707 F.2d 647, 649 (2d Cir. 1983). For involuntary terminations, the date of plan termination has additional importance. When an employer underfunds its pension plan and is unable to finance a minimum level of benefits, PBGC must pay those benefits, and it has the right to recover from the employer the lesser of the amount that the employer underfunded its plan or thirty percent of the employer's net worth on a date chosen by PBGC within 120 days prior to the plan's termination date. *Id.* (citing 29 U.S.C. §§ 1322 and 1362(b)). "Because involuntary termination proceedings often involve bankrupt corporations with deteriorating financial resources, the date of termination can significantly affect the extent of PBGC's recovery from the employer." *Id.* (citation omitted). A late termination date may mean that PBGC will have little chance of recovering anything from a bankrupt employer, while an earlier termination date could give PBGC the right to recover substantial assets from that same employer, based on its higher net worth at an earlier time. *Id.*

Congress expressed a clear preference that termination dates be set in advance to give plan participants warning when their benefits will stop accruing, *see* 29 U.S.C. § 1341(a), but ERISA does not require PBGC to give formal advance notice to plan participants in involuntary termination proceedings. "Congress apparently recognized that, when faced with bankrupt employers and substantial unfunded pension liabilities, PBGC might occasionally wish to establish a retroactive date of termination to limit its own liability." *Broadway Maint.*, 707 F.2d at 649 (citing 29 U.S.C. § 1348(a)). However, despite the importance of termination dates, ERISA does not give PBGC unilateral authority to set them, even in involuntary proceedings. If the plan administrator does not agree with the date proposed by PBGC in an involuntary termination proceeding, a federal district court sets the date of plan termination. 29 U.S.C. § 1348(a)(3)-(4).

With this background in mind, we turn to the case before us.

## A.    Factual Background

Prior to filing for Chapter 11 bankruptcy in 2002, RTI was a leading producer of special bar quality steel products. It was formed as the result of two mergers that occurred in 1998 and 1999. As a result of those transactions, RTI incurred $850 million in secured debt and also became the sponsor and administrator of four defined benefit plans covered by Title IV of the ERISA. Two of the plans, the Republic Technologies International, LLC - USWA Defined Benefit Plan ("RESI plan") and the Republic Technologies International, LLC Pension Plan for Union Eligible Employees at the Lorain Facility ("Union

plan"), provide benefits to participants represented by the USWA. These plans included provisions for "shutdown benefits." Shutdown benefits are enhanced early retirement benefits for certain workers who are affected by a facility shutdown or business cessation. They permit participants who meet certain age and service requirements to begin receiving a retirement benefit after a plant shutdown, rather than having to wait while out of work to reach a specific retirement age. Unlike other early and normal retirement benefits, shutdown benefits usually are not advance-funded.[1] Because this enhanced benefit may be paid for many years before a recipient is eligible for normal retirement benefits, the cost of shutdown benefits can be very high.

Shutdown benefits were continued in the Union Plan and added to the RESI plan as a result of collective bargaining prior to the mergers in 1998. In return for the promise of shutdown benefits, the USWA agreed to concessions, including reduction of wages, elimination of jobs, and modification of health care benefits and work guarantees. The plans provide for two different types of shutdown benefits: a "70/80 benefit" and a "Rule of 65" benefit. A 70/80 benefit allows a participant who is not yet 62 and who has 15 years of service to retire and begin to receive a pension benefit when a shutdown occurs if (1) the participant is at least age 55 and the participant's combined age and years of continuous service equal 70 or more or (2) the participant's combined age and years of service equal 80 or more. A Rule of 65 benefit allows a participant who is not yet 55 and who has at least 20 years of service to retire and begin to receive a pension benefit when a shutdown occurs if the participant's combined age and years of continuous service equal at least 65 but less than 80. Both plans also provided for a $400 monthly supplement in the event of shutdown, payable until the participant is eligible to receive Social Security benefits.

PBGC became concerned about RTI's financial condition as a result of the mergers in 1998 and 1999. It negotiated a series of agreements with RTI to mitigate the risks resulting from RTI's highly leveraged existence coupled with the enhanced benefits provided under the RESI and Union plans. In the first agreement, RTI agreed to make cash payments to the RESI plan in excess of minimum funding requirements. The second agreement required cash payments in excess of minimum funding requirements to the Union plan, as well as a $5 million letter of credit to secure those payments.

In spite of the mergers and agreements, RTI continued to experience financial difficulties as a result of poor market conditions, a softening economy, and a high level of debt. It filed a voluntary petition for bankruptcy on April 2, 2001. In December 2001, RTI and the USWA negotiated a modified labor agreement ("MLA") that required RTI to sell its assets unless it reorganized by May 31, 2002.

During the course of its bankruptcy case, RTI received bankruptcy court approval to sell substantially all of its assets pursuant to a court-supervised bidding process. On May 17, 2002, RTI sought court approval to sell its principal assets to "Newco." Newco expressed an intention to hire 2,500 of RTI's employees, but it did not want to assume liability for RTI's pension plans. When it became clear that RTI would be unable to reorganize, RTI and the USWA negotiated a modified successor labor agreement ("MSLA") that did not require a prospective asset purchaser to continue the pension plans. RTI and the USWA also entered into a shutdown agreement in April 2002 specifying that the sale to Newco would constitute a "shutdown" under the RESI and Union plans. On May 31, 2002, the bankruptcy court scheduled an auction of RTI's assets for July 8, 2002, and a hearing to approve the final sale and the shutdown agreement for July 9, 2002.

---

[1] ERISA requires sponsoring employers to fund defined benefit plans in accordance with statutory minimum funding requirements calculated based on reasonable actuarial assumptions regarding predictable factors such as mortality, retirement age, and investment returns. 29 U.S.C. § 1082 and 26 U.S.C. § 412. Sponsoring employers are not required to fund unpredictable contingent event benefits unless and until the contingency actually occurs. 29 U.S.C. § 1082(d)(1)(B), (5), (7)(B)(i); 26 U.S.C. § 412(l)(1)(B). An "unpredictable contingent event benefit" is any benefit contingent on an event other than: (1) age, service, compensation, death, or disability, or (2) an event which is "reasonably and reliably predictable." 29 U.S.C. § 1082(d)(7)(B)(ii). According to PBGC, shutdown benefits are unpredictable contingent event benefits because they are contingent on the closing of an employer's facility and such closings are not reasonably and reliably predictable.

During this same time period, PBGC was going through the process of determining whether to involuntarily terminate the RESI and Union plans. PBGC follows the same administrative process in every case to determine whether an underfunded plan should be involuntarily terminated and the proposed date of plan termination. The Trusteeship Working Group ("TWG"), an independent body comprised of representatives from PBGC's financial, actuarial, policy and legal offices, reviews all termination recommendations developed by PBGC staff. The TWG presents its recommendations, along with supporting documents, to the "approving official." In cases involving claims of more than $100, the approving official is the Executive Director, who is the head of the agency. The Executive Director's decision is documented in a Notice of Determination and a Termination and Trusteeship Decision Record. On June 11, 2002, the TWG met to consider the staff recommendation that the plans in this case should be terminated. They found that both plans were underfunded and that RTI would not be able to administer the plans after its assets had been sold. Without shutdown benefits, the RESI plan was 23% funded and the Union plan was 47% funded. If the plans terminated with shutdown benefits, the RESI plan would be 14% funded and the Union plan 39% funded. In monetary terms, shutdown benefits potentially increased the amount of unfunded liabilities for the plans by almost $96 million. In light of this information, the TWG determined that the plans should be terminated and that PBGC should establish a termination date prior to shutdown. If the plans were not terminated prior to shutdown, the TWG concluded, "PBGC's long run loss [could] reasonably be expected to increase unreasonably."

On June 12, 2002, the Executive Director concurred in the TWG's recommendation and issued a Notice of Determination pursuant to 29 U.S.C. § 1342(c) for each plan. Copies were sent to the plan administrator and the USWA and they were also published in seventeen newspapers where RTI's facilities were located. The notices indicated PBGC's determination that, "in order to avoid an unreasonable increase in the liability of the PBGC insurance fund and in order to protect the interests of the Plans' participants . . . PBGC intends to proceed pursuant to ERISA § 4042, 29 U.S.C. § 1342, to have the Plans terminated and PBGC appointed as statutory trustee, and . . . to have June 14, 2002 established as the Plans' termination date."

**B.        Procedural History**

On the same day the notices were issued, PBGC commenced an action against RTI to terminate the plans and to set June 14, 2002, as the date of plan termination. On July 11, 2002, the bankruptcy court approved the shutdown agreement and the sale of RTI's assets to Newco. The asset sale to Newco closed on August 16, 2002. On November 1, 2002, PBGC filed a motion for summary judgment, asking the district court (1) to determine that the plans must be terminated to protect the interests of the participants and the PBGC insurance fund, (2) to appoint PBGC trustee of the terminated plans, and (3) to establish June 14, 2002, as the date of plan termination. The USWA filed a motion for partial summary judgment, disputing only the date of plan termination. It asked the court to establish August 17, 2002 – the day after the closing of the asset sale to Newco – as the date of plan termination.

The district court agreed that the plans had to be terminated to protect the interests of the participants and PBGC's insurance fund, but it rejected PBGC's proposed termination date and granted the USWA's motion for partial summary judgment. The court considered the plan participants' reliance interests in shutdown benefits and weighed those interests against PBGC's interest in avoiding an unreasonable increase in unfunded liabilities. The court concluded that, despite PBGC's issuance of the notices on June 12, 2002, the plan participants continued to have strong reliance interests in the receipt of shutdown benefits. In considering PBGC's financial interests, the court found that PBGC had failed to demonstrate that the June 14, 2002 date adequately protected its insurance fund from an unreasonable increase in liability. On balance then, the court determined that "the significant reliance interests" of the plan participants in the receipt of shutdown benefits compelled its selection of August 17, 2002 as the date of plan termination. On appeal, PBGC argues that the plan participants' reliance interests were extinguished once the notices were issued and that the district court should have deferred to its determination that the PBGC insurance fund faced an unreasonable increase in liability if the plans were not terminated prior to "shutdown."

## II.

As mentioned previously, if the plan administrator and PBGC cannot agree on a plan termination date in an involuntary termination proceeding, ERISA provides that the district court will set the date. 29 U.S.C. § 1348(a)(4). Unfortunately, the statute does not provide specific guidance on what factors the court should use when making its selection. *Pension Benefit Guaranty Corp. v. Mize Co., Inc.*, 987 F.2d 1059, 1062 (1993); *Pension Benefit Guaranty Corp. v. Heppenstall Co.*, 633 F.2d 293, 297 (3d Cir. 1980). Beginning with the Third Circuit's decision in *Heppenstall*, courts have considered two factors when setting termination dates in involuntary proceedings: the expectations of the participants and the financial implications of the termination for PBGC. *Pension Comm. for Farmstead Foods Pension Plan for Albert Lea Hourly v. Pension Benefit Guaranty Corp.*, 991 F.2d 1415, 1419 (8th Cir. 1993); *Mize*, 987 F.2d at 1062-63; *Broadway Maintenance*, 707 F.2d at 652-53; *Heppenstall*, 633 F.2d at 301. We agree that these are the most appropriate factors for us to focus on, particularly considering that ERISA provides for involuntary termination proceedings in order "to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund." 29 U.S.C. § 1342(c).

In *Heppenstall*, the trial court had determined that the date of termination should be the date of its final judgment terminating the pension plan. 633 F.2d at 300. On appeal, PBGC argued that the trial court's termination date imposed excessive liability on its insurance fund because it would be liable for the benefits that accrued during the trial and up to the date of final judgment. *Id.* The Third Circuit concluded that the trial court had erred by maximizing the interest of plan participants without taking into account PBGC's interest in protecting itself from unwarranted increases in liability. *Id.* The earliest appropriate date of plan termination was the date "on which participant employees had some reasonable notice that PBGC was seeking termination," because after that date, employees "no longer had a justifiable expectation in the accrual of vested pension rights." *Id.* at 302.

Subsequent courts have expanded upon the analysis in *Heppenstall*. The Fourth Circuit in *Broadway Maintenance* determined that district courts should follow a two-part approach when setting the date of plan termination: first, the court should determine the earliest date when the participants had actual or constructive notice of the plan's termination, *i.e.*, notice sufficient to extinguish their reliance interests. 707 F.2d at 652-53. Once that date has been ascertained, the court "should then select whatever later date serves the interests of PBGC." *Id.* The Eighth Circuit later endorsed this approach in *Mize*. 987 F.2d at 1062-63.

The district court here adopted the statutory construction advanced by *Heppenstall* and its progeny, but noted that the facts of this case nevertheless compelled it "to proceed cautiously before extending the *Heppenstall* analysis to the simplified two-part criteria espoused by *Broadway Maintenance* and *Mize*," because those cases considered the participants' interests in "traditional" pension benefits, whereas this case involved shutdown benefits, which the court described as "inextricably intertwined to the financial well-being of the employer." This distinction was significant in the involuntary termination setting, according to the district court,

> because the factor most likely to give rise to the vesting of shutdown benefits – the financial collapse of the employer – is invariably the event that will give rise to an involuntary termination of the participants' defined benefit plan. Therefore, participants that have fulfilled the timing component of shutdown benefits . . . may reasonably rely that their benefits will vest, even in the event of plan termination, because it is highly likely that the termination will arise from the employer's cessation of operations.

The court also characterized the participants' interests in shutdown benefits as "strong" because after the signing of the shutdown agreement in April 2002, "those participants that had satisfied the timing component of '70/80' or 'Rule of 65' shutdown benefits had a reasonable expectation as to the vesting of those shutdown benefits – subject only to the Bankruptcy Court's approval of the sale to Newco." In light

of these "strong" interests and the nature of shutdown benefits, the court concluded that PBGC's notice to the participants did not "presumptively terminate the participants' reliance interests" in shutdown benefits.

While it is true that the same factor giving rise to the vesting of shutdown benefits is invariably the event that will give rise to an involuntary termination of the participants' defined benefit plan, this does not mean that the participants' reliance interest in shutdown benefits remains "strong" even after they have received notice from PBGC that the plan is about to be terminated at a date prior to the vesting of those benefits. After the employees received notice that PBGC intended to terminate the pension plans on June 14, 2002, the participants "no longer had a justifiable expectation in the accrual of vested pension rights." *Heppenstall*, 633 F.2d at 302. The USWA argues that "the overwhelming majority of courts in disputed termination date cases have chosen a date of plan termination that is on or after the date operations ceased or participants ceased to accrue benefits because of a plan amendment 'freezing' the accrual of additional benefits." (Appellee's Br. at 15, citing *Farmstead Foods*, 991 F.2d at 1421 and *Mize*, 987 F.2d at 1060-61). However, in those cases, the employer-sponsors were seeking earlier termination dates in order to minimize their liabilities to PBGC for their underfunded plans. In this case, PBGC, a self-financing public insurance corporation, is seeking an earlier termination date in order to protect its insurance fund from continued accruals of liabilities by unsound plans. The district court here accorded too much weight to the participants' expectation interests in the receipt of shutdown benefits. Every court to consider the issue has concluded that expectation interests in the accrual of benefits are extinguished on the date the participants receive reasonable notice from PBGC that the plan is going to be terminated.

Moreover, even if we agreed with the district court that PBGC's notice to the plan participants was insufficient to extinguish their reliance interests in the accrual of additional benefits, we cannot characterize their reliance interests prior to receiving the notices of termination as "strong."[2] According to the district court, qualified participants had a strong interest in the vesting of shutdown benefits after the shutdown agreement was signed in April 2002, yet at that time, the shutdown agreement was contingent on bankruptcy court approval, and that approval was not given until July 11, 2002, almost one month *after* PBGC issued the notices of termination. Prior to bankruptcy court approval of the shutdown agreement, the cessation of RTI's operations was the only event that would trigger the vesting of shutdown benefits, and that cessation of operations had not yet occurred.

The district court also failed to give appropriate deference to PBGC's conclusion that it faced an unreasonable increase in its liabilities if the court selected a termination date after "shutdown." The court noted that there was no indication in the record regarding the impact the addition of shutdown benefits would have on PBGC's insurance fund and concluded that this omission was "of particular import because at the time PBGC rendered the termination decisions, its most recent annual report declared a surplus of approximately $7.7 billion." But PBGC is expressly authorized to terminate a plan when "the possible long-run loss of [PBGC] *with respect to the plan* may reasonably be expected to increase unreasonably if the plan is not terminated." 29 U.S.C. § 1342(a)(4) (emphasis added). Notwithstanding the inappropriateness of the district court's assumption that a government entity can afford to withstand an additional $95 million in liabilities because it is currently running at a surplus, courts have never required PBGC to produce evidence indicating the impact of additional liabilities on its insurance fund. In *Mize*, for example, the Fourth Circuit noted that "PBGC's interests should be deemed to be best served by the date proposed by PBGC" and that "PBGC's expertise should be deferred to, at least to the extent of determining its own best interests." 987 F.2d at 1063. No one disputes that PBGC will incur an additional $95 million in liabilities in light of the district court's decision establishing August 17, 2002, as the date of plan termination. The USWA argues that this court should not give deference to PBGC's selection of a termination date because "PBGC's stated reason for seeking the pre-shutdown termination date is to protect its own financial interests." Courts have

---

[2] We note that at the time the USWA and RTI originally negotiated the shutdown benefit, RTI was already in apparent financial difficulty and that the USWA was aware that this benefit was unvested and unfunded.

repeatedly emphasized that the financial interests of *employers* should not play a role in the setting of termination dates, *see Broadway Maint.*, 707 F.2d at 652, but ERISA provides for involuntary termination proceedings precisely so that PBGC can protect its own financial interests and "avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund." 29 U.S.C. § 1342(c). The cases cited by the USWA only indicate that courts should not defer to PBGC's selection of a termination date without also considering the reliance interests of the plan's participants. In this case, the participants' reliance interests were extinguished when PBGC sent out notices indicating its intent to seek termination of the plans. Under *Broadway Maintenance* and *Heppenstall*, the district court therefore should have selected whatever later date served the interests of PBGC, and in this case, that date was June 14, 2002.

As a final note, we emphasize that, in reversing the district court's selection of a termination date, we not only adhere to the statutory scheme of ERISA and follow *Broadway Maintenance* and *Heppenstall*, but also safeguard this insurance system for the benefit of future employees while at the same time honoring the expectations of the plans' participants as much as possible.

**III.**

For the foregoing reasons, we reverse the district court's decision granting partial summary judgment in favor of the USWA and remand this case for further proceedings in accord with this opinion.